## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

In re:

THE HERTZ CORPORATION, *et al.*,

Debtors.[1]

WELLS FARGO BANK, NATIONAL ASSOCIATION, AS INDENTURE TRUSTEE,

Plaintiff,

v.

THE HERTZ CORPORATION; DOLLAR RENT A CAR, INC.; DOLLAR THRIFTY AUTOMOTIVE GROUP, INC.; DONLEN CORPORATION; DTG OPERATIONS, INC.; DTG SUPPLY, LLC; FIREFLY RENT A CAR LLC; HERTZ CAR SALES LLC; HERTZ GLOBAL SERVICES CORPORATION; HERTZ LOCAL EDITION CORP.; HERTZ LOCAL EDITION TRANSPORTING, INC.; HERTZ SYSTEM, INC.; HERTZ TECHNOLOGIES, INC.; HERTZ TRANSPORTING, INC.; RENTAL CAR GROUP COMPANY, LLC; SMARTZ VEHICLE RENTAL CORPORATION; THRIFTY CAR SALES, INC.; THRIFTY, LLC; THRIFTY INSURANCE AGENCY, INC.; THRIFTY RENT A CAR SYSTEM, LLC; and TRAC ASIA PACIFIC, INC.

Defendants.

Chapter 11

Case No. 20-11218 (MFW)

(Jointly Administered)

Adv. Pro. No. 21-_____(MFW)

## **COMPLAINT**

---

[1] The last four digits of The Hertz Corporation's tax identification number are 8568. The location of the debtors' service address is 8501 Williams Road, Estero, FL 33928. Due to the large number of debtors in these Chapter 11 cases, for which joint administration for procedural purposes has been requested, a complete list of the debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the debtors' claims and noticing agent at https://restructuring.primeclerk.com/hertz.

Wells Fargo Bank, N.A. (the "Trustee" or "Plaintiff"), in its capacity as indenture trustee under, as each may have been amended, modified, or supplemented from time to time, that certain indenture (the "2022 Notes Indenture"), dated as of October 16, 2012, for the 6.250% senior notes due 2022 (the "2022 Notes"), that certain indenture (the "2024 Notes Indenture"), dated as of September 22, 2016, for the 5.500% senior notes due 2024 (the "2024 Notes"), that certain indenture (the "2026 Notes Indenture"), dated as of August 1, 2019, for the 7.125% senior notes due 2026 (the "2026 Notes"), and that certain indenture (the "2028 Notes Indenture" and, together with the 2022 Notes Indenture, the 2024 Notes Indenture, and the 2026 Notes Indenture, the "Senior Notes Indentures"), dated as of November 25, 2019, for the 6.000% senior notes due 2028 (the "2028 Notes" and, together with the 2022 Notes, the 2024 Notes, and the 2026 Notes, the "Senior Notes"), for its complaint against Debtors The Hertz Corporation ("THC"), Dollar Rent A Car, Inc. ("Rent A Car"), Dollar Thrifty Automotive Group, Inc. ("Thrifty"), Donlen Corporation ("Donlen"), DTG Operations, Inc. ("DTG"), DTG Supply, LLC ("DTG Supply"), Firefly Rent A Car LLC ("Firefly"), Hertz Car Sales LLC ("Car Sales"), Hertz Global Services Corporation ("Global Services"), Hertz Local Edition Corp. ("Edition Corp."), Hertz Local Edition Transporting, Inc. ("Edition Transporting"), Hertz System, Inc. ("Hertz System"), Hertz Technologies, Inc. ("Hertz Technologies"), Hertz Transporting, Inc. ("Hertz Transporting"), Rental Car Group Company, LLC ("Rental Group"), Smartz Vehicle Rental Corporation ("Smartz"), Thrifty Car Sales, Inc. ("Thrifty Car Sales"), Thrifty, LLC ("Thrifty LLC"), Thrifty Insurance Agency, Inc. ("Thrifty Insurance"), Thrifty Rent A Car System, LLC ("Thrifty Car System"), and TRAC Asia Pacific, Inc. ("TRAC" and, together with Rent A Car, Thrifty, Donlen, DTG, DTG Supply, Firefly, Car Sales, Global Services, Edition Corp, Edition Transporting, Hertz System, Hertz Technologies, Hertz Transporting, Rental Group, Smartz, Thrifty Car Sales, Thrifty

LLC, Thrifty Insurance, and Thrifty Car System, collectively, the "<u>Guarantors</u>" and, the Guarantors together with THC, "<u>Defendants</u>", "<u>Hertz</u>" or the "<u>Company</u>") alleges as follows:

## **INTRODUCTION**

1.     The plan of reorganization confirmed in the Company's Chapter 11 cases (the "<u>Plan</u>")[2] provides that Senior Notes claims will be deemed unimpaired under Section 1124 of the Bankruptcy Code, and leaves this Court to determine what such treatment requires under the circumstances of this case. This adversary proceeding seeks a declaratory judgment that (i) Defendants' voluntary repayment of the Senior Notes in full triggered an obligation to pay the Redemption Price (as defined below) set forth in the Senior Notes Indentures; and (ii) Defendants must, under the extraordinary circumstances of this case, pay the Senior Notes the contract rate of interest for the duration of these Chapter 11 cases.

2.     As this Court, the Defendants, and numerous other parties recognized at the recent confirmation hearing, this is no ordinary Chapter 11 case. Hertz was not insolvent, undercapitalized, or overleveraged in the months leading up to its bankruptcy filing. Rather, the Company operated a strong, profitable business that had experienced ten consecutive quarters of year-over-year growth. That positive momentum was abruptly interrupted by the COVID-19 pandemic. Almost overnight, the Company's revenue fell by more than 90%. More immediately, the COVID-19 crisis distorted the market for used vehicles, triggering a technical default under the Company's asset-backed securities ("<u>ABS</u>") programs unless the Company paid approximately $135 million to maintain compliance with certain collateral value ratios required under the ABS programs. Facing those liquidity demands, Hertz filed for bankruptcy hoping to "utilize the breathing room chapter 11 provides to keep its business intact[.]" *Declaration of Jamere Jackson*

---

[2]     Capitalized terms used but not defined herein shall have the meaning given them in the Plan, filed at Docket Number 5178.

*in Support of Debtors' Petitions and Requests for First Day Relief* [Docket No. 28] ("First Day
Decl.") at ¶ 11.

3.      The Company's crisis was short-lived, and the market immediately signaled that it
understood the Company's predicament was temporary. In the weeks following the Company's
bankruptcy filing, its stock price *rose* 450%, from $0.56 on May 26, 2020 (the first business day
following the bankruptcy filing) to $2.52 on June 10, 2020. Seeking to capitalize on this
"extraordinary opportunity" to raise capital (May 14, 2021 Hr'g Tr. 6:15–17), the Company issued
and sold 13,912,368 shares of common stock, netting approximately $28 million, in *one day* before
the Securities and Exchange Commission forced it to abandon the offering. Thus, from the very
beginning of these cases, the market recognized value in the Debtors' equity.

4.      The market was right. With a large proportion of the U.S. population now
vaccinated against COVID-19 and travel restrictions beginning to ease, the travel sector is
rebounding with extraordinary speed. When the Company began specific efforts toward a plan of
reorganization, investors lined up to sponsor the its emergence from bankruptcy. The Company
eventually narrowed the competing proposals to two feasible, fully committed plans: one
sponsored by the Knighthead / Certares Group and one sponsored by the Alternative Plan
Sponsors. The latter was backed by more than 80% of the Company's largest creditor class,
including the overwhelming majority of the Company's Senior Noteholders. Following a
competitive process that lasted six months and culminated in a 32-hour auction, the Company
selected the Plan sponsored by the Knighthead / Certares Group, which deems all classes of
creditors unimpaired and, according to the Company, distributes "more than $1 billion of value to
existing equity." *Memorandum of Law in Support of Confirmation of Second Modified Third
Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and its Debtor*

*Affiliates* [Dkt. No. 5180] (the "Confirmation Brief") at ¶ 3. The market has concluded that equityholders will receive even more value than that—the Company's market capitalization as of the date of this filing is almost $1.4 billion.

5.    The Plan provides that the Company will repay principal on the Senior Notes (plus postpetition interest at the federal judgment rate) in full, in cash on the Effective Date *and pay any other amounts this Court determines are necessary and appropriate for the Senior Notes to be deemed unimpaired under Section 1124*. There is no question that repaying the Senior Notes in full was a choice made in the exercise of the Company's business judgment—the competing plan proposals were both attractive options, to say nothing of numerous other alternatives available to such a highly solvent debtor.

6.    The Company chose the Knighthead / Certares Group's proposal because it offered a "simpler, cleaner confirmation case." May 11, 2021 Auction Tr. 58:2–4. The Company created that speedy path to confirmation by deeming all creditors unimpaired and depriving them of the right to vote on the Plan. In so doing, it explicitly acknowledged the possibility that the reorganized Company may be ordered by this Court to pay additional amounts to the Senior Notes. That decision to disenfranchise its largest creditor class was within the Company's business judgment, but carries with it certain consequences under the Bankruptcy Code and the Senior Notes Indentures. Under Section 1124, a debtor may deem a class of creditors unimpaired and deprive them of the right to vote on its plan only if the debtor carries its burden to establish that the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest." 11 U.S.C. § 1124(1). As explained below, the Company's voluntary repayment of the Senior Notes triggered an obligation to pay the Redemption Price set forth in the Senior Notes Indentures. That contractual obligation does not fall away because the

Company is in bankruptcy; to the contrary, as the Third Circuit recently held in *Energy Future Holdings*, a debtor that relies on the bankruptcy process to redeem bonds cannot evade a contractually bargained-for redemption provision. *See In re Energy Future Holdings Corp.*, 842 F.3d 255, 261 (3d Cir. 2016).

7.      Had the Senior Noteholders not been deemed unimpaired and thereby prevented from voting, the Plan would not have been confirmed. All other creditor classes were deemed unimpaired and thus deemed to accept the Plan. The Senior Noteholders that were members of the Ad Hoc Group (as defined below) and other unsecured creditors overwhelmingly backed the Alternative Plan Sponsors' proposal, which they believed offered the Company a superior path forward. The majority of the Debtors' unsecured creditors therefore would have voted to reject the Plan, depriving it of the consent necessary for confirmation under Section 1129(a)(10) (and, lacking an impaired accepting class, the Plan was not eligible for cramdown under Section 1129(b)). The Plan was confirmable only because the Company disenfranchised its largest creditor constituency by promising to comply with Section 1124's requirement that the Senior Noteholders' "legal, equitable, and contractual rights" remain entirely "unaltered." Section 1124 protects the Senior Noteholders' rights in two ways.

8.      *First*, Section 1124 protects the Senior Noteholders' right to yield protection at the contractually specified Redemption Price if the Company chooses to repay the Senior Notes before their expected due dates. Nothing in the Bankruptcy Code alters or restricts that right. To the contrary, the plain language of Section 1124 and the principles of equity and fairness underlying the Code *require* that a solvent debtor honor the terms of its bargain when deeming a creditor unimpaired. Accordingly, the Company must pay the Redemption Price as calculated in the Senior Notes Indentures.

9.    *Second*, Section 1124 independently demands payment of the contract rate of interest owed under the Senior Notes Indentures during the pendency of these cases. Section 1124 requires solvent debtors to pay unimpaired creditors postpetition interest at the rate the bankruptcy court deems appropriate. Indeed, Congress *repealed* a prior provision in Section 1124 that allowed debtors to deemed unsecured creditors unimpaired without paying postpetition interest. *See In re PPI Enterprises (U.S.), Inc*., 324 F.3d 197, 202 (3d Cir. 2003) (discussing Congress's decision to repeal Section 1124(3) to "preclude" the "unfair result" of unsecured creditors being "denied the right to receive postpetition interest"). At a minimum, "the Court has the discretion to exercise its equitable power to require, among other things, the payment of post-petition interest, which may be at the contract rate or such other rate as the Court deems appropriate." *In re Energy Future Holdings Corp*., 540 B.R. 109, 118 (Bankr. D. Del. 2015).

10.    The equities of this case require payment of postpetition interest at the contract rate. As the Company has acknowledged, Hertz turned out to be highly solvent, with the Plan "achieving a truly extraordinary Chapter 11 outcome" that "return[ed] over $1 billion of value to [its] shareholders." June 10, 2021 Hr'g Tr. 7:2–3; 8:3–4. And it is undisputed that holders of the Senior Notes contributed significant value to the Company's ultimate success. As Debtors' counsel recognized at confirmation, without the Alternative Plan Sponsors, "including, in particular, the Ad Hoc Group of [Senior Noteholders] competing so hard to win the right to invest in the Company . . . the result would have been far less favorable." June 10, 2021 Hr'g Tr. 10:7–11. Payment of postpetition interest at the contract rate would represent a small fraction of the value flowing to junior stakeholders and would not impair the Company's successful post-emergence operations. Against that backdrop, it would be the height of inequity to demand that the Senior Noteholders provide a thirteen-month interest-free loan to a solvent debtor capable of paying its debts.

11.    That is particularly true where so much value is flowing to equityholders under the Plan. "[T]he rationale for use of the contract rate of interest is straightforward: A debtor with the financial wherewithal to honor its contractual commitments should be required to do so." *In re Dow Corning Corp.* 244 B.R. 678, 695 (E.D. Mich. 1999). "The only good reason for refusing to give a creditor in reorganization all that he bargained for when he extended credit is to help other creditors, the debtor's assets being insufficient to pay all creditors in full." *In re Chicago, Milwaukee, St. Paul & Pac. R.R.*, 791 F.2d 524, 527 (7th Cir. 1986); *see Dow Corning*, 244 B.R. at 695 (quoting same). But here, every other creditor is already being paid in full, and denying the Senior Noteholders their bargained-for rights would serve only to *further* enrich equityholders.

12.    The court "cannot adopt a reading of the Bankruptcy Code which places impaired creditors in a more advantageous position than unimpaired creditors." *In re Ultra Petroleum Corp.*, 624 B.R. 178, 188 (Bankr. S.D. Tex. 2020). If the Senior Noteholders "are limited to the federal judgment rate, they are worse off than if they were impaired under the [Plan]. This is because even though the [Senior Noteholders] would receive identical interest as a hypothetical impaired class, as an unimpaired class the [Senior Noteholders] were deprived of the right to vote for or against the plan." *Id.* Defendants chose a Plan that skipped the solicitation process, but a desire for expediency does not alter the requirements of the Bankruptcy Code.

## THE PARTIES

13.    Plaintiff is a national banking association that serves as indenture trustee under the Senior Notes Indentures.

14.    Defendant THC is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. THC is the issuer of the Senior Notes.

15.    Defendant Rent A Car is organized under the laws of Oklahoma and is one of the

Debtors in these Chapter 11 cases. Rent A Car is guarantor of THC's obligations under the Senior Notes Indentures.

16.     Defendant Thrifty is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Thrifty is guarantor of THC's obligations under the Senior Notes Indentures.

17.     Defendant Donlen is organized under the laws of Illinois and is one of the Debtors in these Chapter 11 cases. Donlen is guarantor of THC's obligations under the Senior Notes Indentures.

18.     Defendant DTG is organized under the laws of Oklahoma and is one of the Debtors in these Chapter 11 cases. DTG is guarantor of THC's obligations under the Senior Notes Indentures.

19.     Defendant DTG Supply is organized under the laws of Oklahoma and is one of the Debtors in these Chapter 11 cases. DTG Supply is guarantor of THC's obligations under the Senior Notes Indentures.

20.     Defendant Firefly is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Firefly is guarantor of THC's obligations under the Senior Notes Indentures.

21.     Defendant Car Sales is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Car Sales is guarantor of THC's obligations under the Senior Notes Indentures.

22.     Defendant Global Services Corporation is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Global Services Corporation is guarantor of THC's obligations under the Senior Notes Indentures.

23.     Defendant Edition Corp. is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Edition Corp. is guarantor of THC's obligations under the Senior Notes Indentures.

24.     Defendant Edition Transporting is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Edition Transporting is guarantor of THC's obligations under the Senior Notes Indentures.

25.     Defendant Hertz System is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Hertz System is guarantor of THC's obligations under the Senior Notes Indentures.

26.     Defendant Hertz Technologies is organized under the laws of Delaware and is one of the Debtors in these Chapter 11cases. Hertz Technologies is guarantor of THC's obligations under the Senior Notes Indentures.

27.     Defendant Hertz Transporting is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Hertz Transporting is guarantor of THC's obligations under the Senior Notes Indentures.

28.     Defendant Rental Group Company is organized under the laws of Delaware and is one of the Debtors in these Chapter 11 cases. Rental Group Company is guarantor of THC's obligations under the Senior Notes Indentures.

29.     Defendant Smartz is organized under the laws of Delaware and is one of the Debtors in these chapter 11 cases. Smartz is guarantor of THC's obligations under the Senior Notes Indentures.

30.     Defendant Thrifty Car Sales is organized under the laws of Oklahoma and is one of the Debtors in these Chapter 11 cases. Thrifty Car Sales is guarantor of THC's obligations under

the Senior Notes Indentures.

31.    Defendant Thrifty LLC is organized under the laws of Oklahoma and is one of the Debtors in these Chapter 11 cases. Thrifty LLC is guarantor of THC's obligations under the Senior Notes Indentures.

32.    Defendant Thrifty Insurance is organized under the laws of Arkansas and is one of the Debtors in these Chapter 11 cases. Thrifty Insurance is guarantor of THC's obligations under the Senior Notes Indentures.

33.    Defendant Thrifty Car System is organized under the laws of Oklahoma and is one of the Debtors in these Chapter 11 cases. Thrifty Car System is guarantor of THC's obligations under the Senior Notes Indentures.

34.    TRAC is organized under the laws of Oklahoma and is one of the Debtors in these Chapter 11 cases. TRAC is guarantor of THC's obligations under the Senior Notes Indentures.

## JURISDICTION, VENUE, AND PREDICATES FOR RELIEF

35.    This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157, 1334, and 2201, Article XI of the Plan, and paragraphs 26 and 27 of the Confirmation Order (as defined below).

36.    The statutory and legal predicates for the relief are 11 U.S.C. § 105(a), 28 U.S.C. § 2201, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Senior Notes Indentures.

37.    This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157 and Bankruptcy Rule 7001, and the Court may enter final orders for matters contained herein.

38.    Venue is proper in the District of Delaware pursuant to 28 U.S.C. § 1409.

39.    Pursuant to Local Bankruptcy Rule 7008-1, Plaintiff states that it consents to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of

the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTS

I. **Hertz Files for Bankruptcy to Navigate Short-Term Liquidity Crisis as a Result of the COVID-19 Pandemic**

40. As 2020 began, the Company had experienced ten consecutive quarters of year-over-year revenue growth. *See* First Day Decl. at ¶ 2. In July 2019, the Company raised $750 million of equity, which it used to repay debt obligations and deleverage its balance sheet. *Id.* The first two months of 2020 showed that "upward revenue trajectory continuing"; company-wide revenue was up 6% year-over-year on 8% higher U.S. car rental volume during that period. *Id.*

41. The COVID-19 pandemic temporarily disrupted this positive momentum. The Company's main business is renting vehicles to air travelers. *Id.* at ¶ 76. COVID-19 "decimated" demand for that core product. *Id.* Almost overnight, revenue dropped by over 90%. June 10, 2021 Hr'g Tr. 7:5–7. The COVID-19 crisis also distorted the market for used vehicles, further straining the Company's liquidity. To maintain access to funding under its ABS programs, the Company must comply with certain collateral value ratios. *See* First Day Decl. at ¶ 84. A 1% drop in vehicle values translates to an approximately $75 million depreciation "true-up" requirement. *Id.* The value of the Company's fleet dropped by more than 1.5% in March and nearly 2.5% in April 2020. *Id.* at ¶ 86. As a result, the Company was required to pay approximately $135 million to maintain compliance with its funding ratios. *Id.* Together with other related payments under its vehicle leases, the Company's payment due April 27, 2020, was approximately $390 million. *Id.* Satisfying that obligation "would have consumed a substantial portion of the Company's available cash, with the likelihood of larger depreciation true-up payments coming due in the following months." *Id.* Accordingly, the Company elected not to make the April 27 payment. *Id.*

42.     The lease default allowed holders of the ABS Notes to direct the liquidation of vehicles serving as collateral for the notes. *Id.* at ¶ 91. Before liquidation could begin, the Company reached an agreement (the "Forbearance Agreement") to forestall that remedy. *Id*. Simultaneously, the Company entered into agreements (the "Waiver Agreements") with certain lenders under its first-lien credit facilities to waive actual or potential defaults triggered by or relating to the Company's ABS lease default. *Id.* at ¶ 92. The Forbearance Agreement and Waiver Agreements were set to expire on May 22, 2020. *Id.* Unable to obtain further concessions from its lenders, the Company filed for bankruptcy on May 22 to "utilize the breathing room chapter 11 provides" to navigate the COVID-19 crisis. *Id.* at ¶ 11.

## II.    Hertz Overcomes Short-Term Crisis and a Bidding War for Ownership of the Company Ensues

43.     The market signaled early in these Chapter 11 cases that it understood the Company's predicament was temporary. After Hertz's stock price sharply increased following the bankruptcy filing, the Company sought to capitalize on the "extraordinary opportunity" to raise capital by issuing additional equity. May 14, 2021 Hr'g Tr. 6:15–17. On June 11, 2020, the Debtors filed a motion seeking authority to sell common stock of Hertz Global Holdings, Inc. ("HGH") to raise up to $1 billion, noting that the "rise in the trading price of Hertz's shares indicates that the market believes that the shares have significant value." *Debtors' Emergency Motion for Authority to Enter Into a Sale Agreement with Jefferies LLC and to Sell Shares of Common Stock of Debtor Hertz Global Holdings, Inc. Through At-The-Market Transaction* [Dkt. No. 387] (the "Equity Sale Motion") at ¶ 20. On June 12, 2020, the Court entered an order granting the Equity Sale Motion [Dkt. No. 417], and on June 15, 2020, the Debtors commenced an "at the market" offering of up to $500 million of HGH's common stock. That afternoon, the SEC notified the Debtors that it was reviewing the transaction. *See Disclosure Statement for the Fourth Modified Second Amended*

*Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and its Debtor Affiliates* (the "Disclosure Statement") [Dkt. No. 4130] at 51. Before the Company terminated the program in response to the SEC's inquiry, HGH issued and sold 13,912,368 shares of common stock, netting approximately $28 million, *in a single day*. *Id.* From the very outset of these cases, the market recognized the value in the Debtors' equity, clearly indicating it believed the Company was solvent, or would become solvent before it emerged from bankruptcy.

44.    The market was right. As the COVID-19 pandemic wanes in the U.S. and across much of the globe, the travel sector is booming. Travel spending is expected to increase by more than 20% in both 2021 and 2022.

**USTA Travel Data Indexed to 2019 Numbers**
Sources: U.S. Travel Association's Spring 2021 Forecast Model, Tourism Economics



The stock of Avis Budget Group, Inc., the Company's primary competition and closest comparable, is up 123% year-to-date and currently trades at near all-time highs reached in early June 2021. By the time the Company began specific efforts toward a plan of reorganization, investors were lining up to sponsor its emergence from bankruptcy.

45.    The Debtors initially received credible proposals from at least three different potential sponsor groups, including: (i) the ad hoc group of holders of the Senior Notes (the "Ad

Hoc Group"); (ii) a group led by Knighthead Capital Management, LLP ("Knighthead") and Certares Opportunities LLC and its affiliates ("Certares," and together with Knighthead, the "Knighthead / Certares Group"); and (iii) a group led by Centerbridge Partners, L.P. ("Centerbridge"), Warburg Pincus LLC ("Warburg"), and Dundon Capital Partners, LLC ("Dundon," and, together with Centerbridge and Warburg, the "CWD Group"). *See* Disclosure Statement at 6.

46.     The Debtors reviewed the various proposals and, on March 1, 2021, determined that the plan proposed by the Knighthead / Certares Group was the most favorable. *Id.* On March 2, Hertz filed the Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and its Debtor Affiliates (the "Initial Plan") [Dkt. No. 2912] and disclosure statement [Dkt. No. 2913] that incorporated the Knight / Certares Group proposal. *Id.*

47.     Shortly after the Debtors filed the Initial Plan, the CWD Group and the Ad Hoc Group (collectively, the "Alternative Plan Sponsors") submitted a joint proposal that improved substantially upon the Knighthead / Certares Group's proposal. *Id.* On April 3, the Debtors concluded that the Alternative Plan Sponsors' proposal offered a better transaction and filed a second amended plan (the "Second Amended Plan") [Dkt. No. 3598] and associated disclosure statement (the "Disclosure Statement for the Second Amended Plan") [Dkt. No. 3599] incorporating that proposal, while continuing to negotiate with the Knighthead / Certares Group. *Id.* at 7. The Second Amended Plan reflected a total enterprise value of approximately $5.4 billion and equity valuation of $4.2 billion. *See* Disclosure Statement for Second Amended Plan at 8. The Debtors' secured creditors would be paid in full in cash, holders of General Unsecured Claims would receive cash distributions in an estimated amount of 75% of the allowed amount of such claims, and holders of Unsecured Funded Debt Claims—which included the Senior Notes Claims

and the ALOC Facility Claims—would receive 48.2% of the equity in the reorganized Company in exchange for their claims. *Id.* at 9–10.

48.     Following the filing of the Second Amended Plan, the Debtors continued to negotiate with the various plan sponsors and with the Official Committee of Unsecured Creditors (the "UCC"). *See* Disclosure Statement at 6. To obtain the UCC's support for the Second Amended Plan, the Debtors and the Alternative Plan Sponsors agreed to certain modifications. Among other things, the Alternative Plan Sponsors agreed to increase recoveries for General Unsecured Creditors to 82%. *See Third Modified Second Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and its Debtor Affiliates* (the "Third Modified Second Amended Plan") [Dkt. No. 3954] Art. III.B.7. On April 14, 2021, the UCC executed a joinder agreement in respect of the plan support agreement and, on April 16, the Debtors filed the Third Modified Second Amended Plan reflecting the modifications negotiated with the UCC.

49.     In the early morning of April 16, on the eve of the hearing to consider approval of the disclosure statement for the Third Modified Second Amended Plan, the Debtors received an unsolicited further proposal from the Knighthead / Certares Group. *See* Disclosure Statement at 7. In light of this development, the Bankruptcy Court continued the disclosure statement hearing until April 21. *Id.*

50.     Between April 16 and April 21, the Debtors continued to negotiate with both the Knighthead / Certares Group and the Alternative Plan Sponsors. Through this process, the Alternative Plan Sponsors agreed to certain enhancements to their proposal, including increasing the estimated recovery for holders of General Unsecured Claims to 100% and issuing to the Debtors' equityholders six-year warrants to purchase 4% of the reorganized Debtors' stock with a strike price set based on a total equity value of approximately $6.1 billion. *Id.* at 7–8. On April 21,

the Board of Directors of HGH and THC determined that the Alternative Plan Sponsors' proposal represented the highest and best proposal available to the Debtors. *Id.* That same day, the Bankruptcy Court approved the Disclosure Statement in respect of the Third Modified Second Amended Plan reflecting the Alternative Plan Sponsors' proposal.

51.     The Knighthead / Certares Group continued to express interest in sponsoring a plan. Concerned that a protracted bidding war would jeopardize the Company's ability to emerge from bankruptcy in time to capitalize on the travel boom expected in the third quarter of 2021, the Debtors filed the Debtors' Emergency Motion for Entry of an Order (i) Establishing Bidding and Auction Procedures Relating to the Submission of Alternative Plan Proposals, (ii) Setting a Hearing for the Approval of (a) the Successful Bidder and (b) Authorization of Supplemental Solicitation Materials and (iii) Granting Related Relief (the "Bid Procedures Motion") [Dkt. No. 4208]. The Bid Procedures Motion sought approval of bid procedures to put a "structured process and definitive timeline" on the competing proposals. Bid Procedures Motion at ¶ 7. The procedures were approved at an uncontested hearing on April 28. Pursuant to the bid procedures, (i) the Knighthead / Certares Group had until May 2 at 5 p.m. ET to submit an alternative qualified proposal; (ii) the Debtors had to determine within two days whether the proposal was a "superior transaction"; (iii) the CWD Group had three days to inform the Debtors whether they intended to counterbid; and (iv) if the CWD Group intended to counterbid, an auction would be held on May 10, 2021 at 10:30 a.m. *Id.* at ¶¶ 5–6.

52.     Consistent with the Bidding Procedures, on May 2, the Knighthead / Certares Group submitted a qualified proposal, which the Debtors determined was a "superior proposal." *See* Confirmation Brief at ¶ 24. On May 5, the Alternative Plan Sponsors informed the Company that they intended to counterbid, forcing an auction. *Id.*

53.     The auction began on May 10 at 11:30 a.m. After several rounds of bidding over the course of 20 consecutive hours, the Debtors determined that the last bids from each of the plan sponsors were substantially equivalent. *Id.* at ¶ 25. Accordingly, the Debtors requested that the competing plan sponsors submit their best and final bids. *Id.* The Finance Committee of the Board of Directors and then the full Board of Directors, in consultation with the Debtors' legal and financial advisors, analyzed the bids and concluded, approximately 32 hours after the commencement of the auction, that the bid submitted by the Knighthead / Certares Group was superior. *Id.* Critically, the final bid proposed paying the Senior Notes and all other creditors of the estate in full and deeming all classes of claims unimpaired.

III.    **Hertz Seeks Confirmation of a Plan of Reorganization that Distributes More Than $1 Billion of Value to Equityholders**

54.     On May 12, 2021, the Debtors notified the Bankruptcy Court that the Knighthead / Certares Group was selected as the successful bidder and submitted forms of a revised Chapter 11 plan [Dkt. No. 4667] and supplemental disclosure (the "Supplemental Disclosure Statement") [Dkt. No. 4759] describing the terms of the Knighthead / Certares Group's bid. Among other things, the bid provided for payment in full to all creditors, subject, in the case of General Unsecured Creditors, to dilution in the event that the actual allowed amount of general unsecured claims exceeded the Debtors' estimates (but, in any event, General Unsecured Creditors would recover no less than 82%). *Id.*

55.     Subsequently, the Knighthead Certares Group modified their bid to further improve the treatment of General Unsecured Creditors to provide for payment in full on account of their allowed claims because, as Debtors' counsel conceded, it "just didn't make sense for there to be *any potential limitation* on the recovery of the general unsecured claims in the face of a plan that was providing such a rich return to the shareholders." May 14, 2021 Hr'g Tr. 12: 16–22 (emphasis

added). On June 6, the Debtors filed the Plan reflecting these modifications. *See Second Modified Third Amended Joint Chapter 11 Plan of Reorganization of the Hertz Corporation and its Debtor Affiliates* [Dkt. No. 5178].

56.    The Plan to distribute more than $1 billion in value to equityholders, consisting of: (i) cash in an amount equal to $1.53 per share of existing equity (totaling $240 million); (ii) a pro rata share of 3% of reorganized equity, subject to dilution from the management incentive plan and new warrants; and (iii) its pro rata share of either: (a) new 30-year warrants for 18% of reorganized equity struck at a $6.5 billion total enterprise value; or (b) subscription rights for a $1.635 billion equity rights offering (the "Rights Offering"). *See* Supplemental Disclosure Statement at 1–2. The Debtors estimate that the aggregate value of the consideration to be provided to equityholders is approximately $7 to $8 per share. *See* Confirmation Brief at ¶ 25.

57.    With respect to the Senior Notes, the Plan proposed to pay the principal amount, plus all accrued and unpaid prepetition interest at the rate prescribed in the Senior Notes Indentures, plus all accrued and unpaid postpetition interest "at the applicable rate" and all "costs and other fees" required to render the Senior Notes claims unimpaired within the meaning of Section 1124 of the Bankruptcy Code. *See* Supplemental Disclosure Statement at 11.

58.    Separately, the proposal was partially financed by providing the Senior Noteholders an option to participate in the Rights Offering. Senior Noteholders who elected to participate in the offering would waive their right to seek payment of the make-whole premium and postpetition interest at the contract rate on account of the Senior Notes actually tendered in the Rights Offering. The Debtors conceded at the Disclosure Statement hearing that the offering would not impact Plaintiff's right to pursue payment of the Redemption Price on behalf of Senior Notes not actually tendered. *See* May 14, 2021 Hr'g Tr. 43:10–44:5 (conceding that irrespective of whether "1" or

"100,000" bondholders elected to participate in the Rights Offering, there would be "no class waiver" of the right to seek payment of the Redemption Price). As shown in the table below, most Senior Noteholders elected to pursue payment of the Redemption Price in full rather than participate in the Rights Offering. The total Redemption Price payable on account of Senior Notes not actually tendered in the Rights Offering is approximately $272 million.[3]

| Rights Offering Results | | | | | |
|---|---|---|---|---|---|
| | 2022 Notes | 2024 Notes | 2026 Notes | 2028 Notes | Total |
| Total Principal | $500 | $800 | $500 | $900 | $2,700 |
| (-) Tendered Amounts | (293) | (379) | (51) | (110) | (833) |
| **Total Principal Not Tendered** | **$207** | **$421** | **$449** | **$790** | **$1,867** |
| *% Tendered* | *59%* | *47%* | *10%* | *12%* | *31%* |
| | | | | | |
| **Redemption Price** | | | | | |
| Redemption Price | $14 | $38 | $83 | $140 | $275 |
| (-) Federal Judgement Rate Interest | (0) | (1) | (1) | (1) | (3) |
| **Total Redemption Price, Net of FJR** | **$14** | **$37** | **$82** | **$139** | **$272** |

59.     As they have done consistently throughout these cases, the Trustee and the Ad Hoc Group worked cooperatively with the Debtors to ensure that the Plan preserved their ability to seek payment of the Redemption Price in full while also ensuring that the Debtors could proceed to confirmation on a consensual basis and emerge from bankruptcy by June 30. As a result of these negotiations, the Debtors included language in the Confirmation Order providing that

> Notwithstanding any provision of the Plan or this Confirmation Order to the contrary…the rights of the [Plaintiff]…and the Holders of [Senior Notes Claims] to fully seek allowance against the Debtors of all make-whole, premium, and/or contract interest issues under the [Senior Notes] Indentures…are fully preserved to the extent necessary to render the [Senior Notes Claims] Unimpaired, and nothing in the Plan or Confirmation Order shall prejudice such litigation… Any such additional amounts will be paid to the extent Allowed by a Final Order of the Bankruptcy Court as provided in the Plan.

Order (I) Confirming Second Modified Third Amended Joint Chapter 11 Plan of

---

[3]     A more detailed analysis showing the amounts payable to the Senior Noteholders on account of Senior Notes not tendered in the Rights Offering is attached hereto as **Exhibit A**.

Reorganization of the Hertz Corporation and its Debtor Affiliates and (II) Granting

Related Relief at ¶ 25 (the "<u>Confirmation Order</u>") [Dkt. No. 5261]. The Confirmation

Order further provides that

> Notwithstanding any provision of the Plan or this Confirmation Order to the contrary…the [Plaintiff] shall be entitled to fully seek allowance of any additional amounts, including without limitation, damages, fees, indemnities, costs, expenses or other amounts and such amounts shall be allowed to the extent required to render the [Senior] Notes Claims Unimpaired. Any such additional amounts will be paid to the extent Allowed by a Final Order of the Bankruptcy Court as provided in the Plan.

*Id.* at ¶ 27. The Confirmation Order requires that the Debtors pay the fees and expenses incurred

by Plaintiff in litigating the make-whole and postpetition interest issues, subject to the Debtors'

right to object to such fees and costs on reasonableness grounds (as to amount only). *Id.* at ¶ 26.

60.    With their right to pursue payment of the Redemption Price fully preserved, the

Senior Noteholders did not object to the Plan. The Court confirmed the Plan on June 10, clearing

the Debtors' path to emerge from bankruptcy by June 30.

**IV.    <u>The Senior Notes Indentures Require Payment of the Specified Redemption Price if the Company Chooses to Redeem the Senior Notes</u>**

61.    Each of the Senior Notes Indentures includes a section titled "Redemption" that

defines the Company's obligations if the Company chooses to redeem any of the Senior Notes.

62.    If the Company exercises "its option" to redeem during the first three years of such

Senior Note's term, the Company must pay a redemption price equal to 100.0% of the principal

amount of the notes, plus the "Applicable Premium as of, and accrued but unpaid interest, if any,

to, the Redemption Date." 2028 Notes First Supplemental Indenture § 6(b), 2026 Notes First

Supplemental Indenture § 6(c), 2024 Notes First Supplemental Indenture § 6(d), 2022 Notes

Second Supplemental Indenture § 6(d). "Applicable Premium" is defined as:

> the greater of (i) 1.00% of the principal amount of such [Note] and (ii) the excess of (A) the present value at such Redemption Date, calculated as of the date of the

applicable redemption notice, of (1) the redemption price of such [Note] on [the third anniversary of the issuance of such Note], plus (2) all required remaining scheduled interest payments due on such [Note] through such date (excluding accrued and unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (B) the principal amount of such…Note on such Redemption Date.

*Id.*

63.    If the Company chooses to redeem the Senior Notes *after* the first three years of the Senior Notes' respective terms, it must pay the specified redemption price, which is expressed as a percentage of the principal amount "plus accrued and unpaid interest, if any, to, but not including, the relevant Redemption Date" (the specified redemption price, plus accrued and unpaid interest, plus the Applicable Premium, as applicable, the "Redemption Price"). 2028 Notes First Supplemental Indenture § 6(a), 2026 Notes First Supplemental Indenture § 6(a), 2024 Notes First Supplemental Indenture § 6(a), 2022 Notes Second Supplemental Indenture § 6(a). The applicable Redemption Price steps down every 12 months. *Id.*

64.    The Senior Notes Indentures provide that if the Redemption Price for any Senior Note called for redemption shall not be paid in full upon surrender of the note for redemption, the principal and premium shall, until paid, bear interest from the Redemption Date at the rate borne by the respective Senior Note. *See* 2028 Notes Indenture § 10.05, 2026 Notes Indenture § 10.05, 2024 Notes Indenture § 10.07, 2022 Notes Indenture § 10.07.

65.    The Senior Notes Indentures further provide that if the Company files for bankruptcy "the principal of and accrued but unpaid interest on all the Outstanding Notes of such series will *ipso facto* become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder." 2028 Notes Indenture § 6.02, 2026 Notes Indenture § 6.02, 2024 Notes Indenture § 6.02, 2022 Notes Indenture § 6.02.

## V.    The Debtors Have Effected a Voluntary Redemption of the Senior Notes

66.    The Plan provides that the Company will repay the Senior Notes in full, in cash on the Effective Date.  Under New York law, which governs the Senior Notes Indentures, contractual redemption premiums are enforceable as liquidated damages provisions where, as here, the amount of liquidated damages bears a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult to estimate precisely. *See, e.g., In re United Merchants & Mfrs., Inc.*, 674 F.2d 134, 143 (2d Cir. 1982); *JMD Holding Corp. v. Cong. Fin. Corp.*, 4 N.Y.3d 373, 380 (2005); *Walter E. Heller & Co. v. Am. Flyers Airline Corp.*, 459 F.2d 896, 899 (2d Cir. 1972); *In re Vanderveer Ests. Holdings, Inc.*, 283 B.R. 122, 129 (Bankr. E.D.N.Y. 2002).

67.    The Senior Noteholders' enforceable state law right to payment of the Redemption Price does not fall away because the Company is in bankruptcy. In *Energy Future Holdings*, the Third Circuit addressed this issue in closely analogous circumstances with virtually identical indenture language. *See In re Energy Future Holdings Corp.*, 842 F.3d at 251–55. There, the first-lien bond indenture provided that "[a]t any time prior to December 1, 2015, [EFIH] may redeem all or a part of the Notes at a redemption price equal to 100% of the principal amount of the Notes redeemed plus the Applicable Premium . . . and accrued and unpaid interest[.]" *Id.* at 254. The indenture likewise contained an acceleration provision that made "all outstanding Notes . . . due and payable immediately" if the issuer filed for bankruptcy, but did not accelerate payment of any "premium" upon such a filing.

68.    Shortly after filing for bankruptcy, the EFIH debtors sought to take advantage of favorable debt market conditions and refinanced the notes. *Id.* at 251–52. The debtors argued that they were not obligated to pay the contractually prescribed redemption price (i.e., the make-whole), because the notes accelerated upon the bankruptcy filing and (they claimed) a post-maturity refinancing was not a redemption. *Id.* at 253. The bankruptcy court declined to award the

make-whole, but the Third Circuit reversed. "[W]hat happens," the court of appeals asked, "when one provision of an indenture for money loaned provides that the debt is accelerated if the debtor files for bankruptcy and while in bankruptcy it opts to redeem that debt when another indenture provision provides for a redemption premium?" *Id.* at 250.

69.     The Third Circuit's unqualified answer was that "the premium, meant to give the lenders the interest yield they expect" does not "fall away because the full principal amount is now due…" *Id.* "New York and federal courts deem 'redemption' to include both pre- and post-maturity repayments of debt." *Id.* at 255. If the debtor wanted its obligation to pay the make-whole on optional redemption to terminate on acceleration of its debt, it needed to make that clear. *Id.* at 261. Unless the indenture specifies otherwise, the repayment of bonds constitutes a redemption irrespective of whether the repayment occurs while the issuer is in bankruptcy. Moreover, the redemption was optional because the debtors "filed for chapter 11 protection voluntarily" and, once there, had "no obligation" to redeem the notes—the debtors could have reinstated the accelerated notes' original maturity date under Section 1124(2) rather than paying them off. *Id*. at 255. The Third Circuit emphasized that when EFIH redeemed the notes, "it did so on a non-consensual basis, that is, over the Noteholders' objection." *Id.* Accordingly, the Court reasoned, "[l]ogic leaves no doubt this redemption of the Notes was [o]ptional." *Id.* In sum, the Third Circuit held that the make-whole premium was payable because (i) nothing in the indentures suggested that the obligation to pay the premium terminated upon acceleration of the debt and (ii) the debtors were not obligated to redeem the notes and in fact, chose to do so over the noteholders' objection.

70.     The circumstances here fall squarely within this holding. The language of the Senior Notes Indentures is virtually identical to the language of the indentures at issue in *Energy Future Holdings*. Nothing in the Senior Notes Indentures suggests that the Debtors' obligation to

pay the Redemption Price terminated upon the Company's bankruptcy filing. There is also no question that the redemption of the Senior Notes was optional. Like the debtors in *Energy Future Holdings*, Hertz filed for bankruptcy voluntarily. Once in bankruptcy, it had several options to choose from to emerge from Chapter 11. The Debtors could have reinstated the Senior Notes or they could have chosen the plan sponsored by the Alternative Plan Sponsors. The alternative plan was feasible, fully committed, and (unlike the plan sponsored by the Knighthead / Certares Group) had wide support from the Company's creditor base. *See* May 11, 2021 Auction Tr. 57:19 – 25 (Debtors' counsel noting the Bankruptcy Court was "likely to confirm" the plan proposed by the Alternative Plan Sponsors).

71.     The alternative plan also proposed a far superior postpetition capital structure. Pursuant to the Plan, the Debtors issued $1.5 billion of expensive, above-market non-convertible preferred stock (the "Preferred Stock") to certain of the Plan sponsors. The Preferred Stock accrues dividends at a rate beginning at 9% per annum for the first two years following the Effective Date. *See* Supplemental Disclosure Statement at 9. Thereafter, unless the stock is redeemed (at a significant premium) dividends step up semi-annually and latter annually. Debtors' counsel conceded that the postpetition capital structure "scored strongly" in favor of the alternative plan because the Company "would really prefer not to have the [Preferred Stock] in its capital structure." May 11, 2021 Auction Tr. 55:6–7.

72.     Nevertheless, the Company chose the Knighthead / Certares Group's proposal because it provided a "simpler, cleaner confirmation case" by deeming all creditors unimpaired and depriving them of the right to vote on the Plan and potentially delay confirmation. May 11, 2021 Auction Tr. 58:2–4. In so doing, it explicitly assumed a potential liability for payment of the Redemption Price in full—the Company determined that the Knighthead / Certares Group's

proposal was in the best interests of its creditors and equityholders even if the Company was required to pay the Senior Noteholders the contractually prescribed Redemption Price. Notably, Company's equityholders endorsed this decision and voted in favor of the Plan knowing that the reorganized Company would assume this potential liability.

73.     The Debtors, in their business judgment and over the Senior Noteholders' objection, chose the proposal that undertook those potential obligations and guaranteed the Company's emergence from Chapter 11 by June 30 by disenfranchising unsecured creditors. That decision was not required by the Bankruptcy Code and was not the Debtors' only option— "logic leaves no doubt this redemption of the [Senior] Notes was optional" and therefore required payment of the Redemption Price. *In re Energy Future Holdings Corp.*, 842 F.3d at 255; *see also Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039 (2d Cir. 1982) (holding that a voluntary plan of liquidation constitutes an optional redemption that triggers payment of a make-whole premium).

## VI.     <u>Section 1124(1) Requires Payment of the Contractually Prescribed Redemption Price</u>

74.     Section 1124 imposes a high bar on debtors seeking to deprive creditors of the right to vote on a plan. As relevant here, Section 1124(1) states that a claim may be deemed "unimpaired" under a plan only when the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." 11 U.S.C. § 1124(1). Congress has "defined impairment in the broadest possible terms," *In re Tucson Self-Storage, Inc.*, 166 B.R. 892, 895 (B.A.P. 9th Cir. 1994), and as this Court has explained, "if the proposed plan of reorganization does not leave the creditor's rights *entirely unaltered*, the creditor's claim is impaired." *In re Coram Healthcare Corp.*, 315 B.R. 321, 351 (Bankr. D. Del. 2004) (emphasis added) citing *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d at 202. "The Bankruptcy Code creates a presumption of impairment," *In re PPI Enterprises (U.S.), Inc.*, 324 F.3d at 203, and the Debtors

therefore bear the burden of showing that the Plan leaves the Senior Noteholders' rights "entirely unaltered." The Debtors cannot meet that burden here until and unless they pay the Redemption Price in full.

75.    As demonstrated above, the Senior Notes Indentures clearly provide for payment of the Redemption Price, and nothing in the Bankruptcy Code eliminates that right. Courts have consistently held that make-whole premiums like the Redemption Price are enforceable liquidated damages provisions that a debtor must honor in order to deem a class of creditors unimpaired. *See In re Trico Marine Servs., Inc.*, 450 B.R. 474, 480–81 (Bankr. D. Del. 2011) (explaining that the "substantial majority of courts" have "concluded that make-whole or prepayment obligations are in the nature of liquidated damages rather than unmatured interest."); *see also In re Sch. Specialty, Inc.*, 2013 WL 1838513, at *5 (Bankr. D. Del. Apr. 22, 2013) (holding that make-whole premium should not be disallowed as unmatured interest); *C.C. Port, Ltd. v. Davis-Penn Mortg. Co.*, 61 F.3d 288, 289 (5th Cir. 1995) ("Where the contract grants the borrower the right to prepay, a prepayment premium is not compensation for the use, forbearance, or detention of money, rather it is a charge for the option or privilege of prepayment."); *In re Ultra Petroleum Corp.*, 624 B.R. at 188 (holding that the debtor must pay the make-whole premium to deems unsecured creditors unimpaired under Section 1124(1)); *In re Lappin Elec. Co.*, 245 B.R. 326, 330 (Bankr. E.D. Wisc. 2000) ("[T]his court is in agreement with a majority of courts that view a prepayment charge as liquidated damages, not as unmatured interest or an alternative means of paying under the contract."); *In re Outdoor Sports Headquarters, Inc.*, 161 B.R. 414, 424 (Bankr. S.D. Ohio 1993) ("Prepayment amounts, although often computed as being interest that would have been received through the life of a loan, do not constitute unmatured interest because they fully mature pursuant to the provisions of the contract."); *In re Skyler Ridge*, 80 B.R. 500, 508 (Bankr. C.D. Cal. 1987)

("Liquidated damages, including prepayment premiums, fully mature at the time of breach, and do not represent unmatured interest.") (citation omitted).

76.     In sum, Defendants' voluntary repayment of the Senior Notes triggered an obligation to pay the Redemption Price set forth in the Senior Notes Indentures. Nothing in the Bankruptcy Code disturbs the Senior Noteholders' right to payment of the Redemption Price. Accordingly, the Debtors must pay the Redemption Price in full to meet Section 1124(1)'s requirement that the Plan leave the Senior Noteholders' rights entirely unaltered.

**VII.    Section 1124(1) Requires Payment of the Contract Rate of Interest for the Duration of the Chapter 11 Case**

77.     Even if the Debtors' voluntary repayment of the Senior Notes did not trigger the obligation to pay the Redemption Price in full (which it did), Section 1124(1) independently demands payment of the contract rate of interest owed under the Senior Notes Indentures during the pendency of this case. Section 1124(1) of the Bankruptcy Code provides that a plan must leave "unaltered" the "legal, *equitable*, and contractual rights to which such claim . . . entitles the holder of such claim." 11 U.S.C. § 1124(1) (emphasis added). Congress's intent is clear from the plain language of the statute: bankruptcy courts must evaluate the equities of the case to determine whether a debtor may deprive a class of creditors of the right to vote on its plan. *See United States v. Cooper*, 396 F.3d 308, 312 (3d Cir. 2005) ("It is a well-known canon of statutory construction that courts should construe statutory language to avoid interpretations that would render any phrase superfluous."). The equities of this case indisputably favor payment of postpetition interest at the contract rate.

78.     The general equitable rule, dating back to the Eighteenth Century, is that creditors of a solvent debtor have a presumptive right to payment of interest at the contract rate. *See Gencarelli v. UPS Cap. Bus. Credit*, 501 F.3d 1, 7 (1st Cir. 2007) ("This is a solvent debtor case

and, as such, the equities strongly favor holding the debtor to his contractual obligations as long as those obligations are legally enforceable under applicable non-bankruptcy law."); *In re Ultra Petroleum Corp.*, 943 F.3d 758, 765 (5th Cir. 2019) ("[W]hen a debtor is solvent, it is the role of the bankruptcy court to enforce the creditors' contractual rights."); *In re Dow Corning Corp.*, 456 F.3d 668, 679-80 (6th Cir. 2006) ("Courts in solvent debtor cases have overwhelmingly concluded that there is a presumption that the default interest rate should be allowed."); *Gen. Elec. Capital Corp. v. Future Media Prods., Inc.*, 547 F.3d 956, 961 (9th Cir. 2008) ("The bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law."); *In re Laymon*, 958 F.2d 72, 75 (5th Cir. 1992) (contract rate applies absent inequitable or unconscionable result); *In re Terry Ltd. P'ship*, 27 F.3d 241, 243 (7th Cir. 1994) (noting "presumption in favor of the contract rate subject to rebuttal based on equitable considerations").

79.    Congress endorsed this general equitable principle when it repealed Section 1124(3) of the Bankruptcy Code, which purportedly allowed debtors to deem unsecured creditors unimpaired without paying postpetition interest. As the Third Circuit recognized in *In re PPI Enterprises*, Congress removed that provision in direct response to the bankruptcy court's decision in *In re New Valley Corp.*, 168 B.R. 73 (Bankr.D.N.J.1994). *See In re PPI Enterprises (U.S.), Inc.*, 324 F.3d at 206. In *New Valley*, the bankruptcy court held that Section 1124(3) allowed a solvent debtor to pay the "allowed" claims of unsecured creditors in full, excluding postpetition interest, without risking impairment. *See In re New Valley Corp.*, 168 B.R. at 77–80. The *New Valley* court concluded that the portion of a creditor's claim that was not "allowed" under the Bankruptcy Code need not be paid after a bankruptcy filing, even if the claim would be recoverable in a non-bankruptcy context. *Id.* In response to that decision, Congress repealed Section 1124(3) to

"preclude" the "unfair result" of unsecured creditors being "denied the right to receive postpetition interest." *In re PPI Enterprises (U.S.), Inc*., 324 F.3d at 205 citing H.R. Rep. No. 103-835, at 47–48 (1994); *see also In re Ultra Petroleum Corp*., 624 B.R. at 200 (explaining that Congress's repeal of Section 1124(3) in response to the *New Valley* decision demonstrates that the solvent debtor exception survived the enactment of the Bankruptcy Code).

80.      In short, Section 1124 requires solvent debtors to pay the Senior Noteholders an equitable quantum of postpetition interest for the Company's continued use of their funds during the pendency of this case. Judge Sontchi recognized as much in *Energy Future Holdings*, where he concluded, in light of the Third Circuit's decision in *In re PPI Enterprises* and the plain language and legislative history of Section 1124, that the court must evaluate equitable principles to determine the rate at which postpetition interest must be paid to deem an unsecured claim unimpaired. *See In re Energy Future Holdings Corp*., 540 B.R. at 124. The Fifth Circuit echoed this reasoning in *In re Ultra Petroleum*, where it explained that the "bankruptcy court's equitable power to enforce the solvent debtor exception is moored in 1124's command that the plan leave unaltered . . . equitable . . . rights." *In re Ultra Petroleum Corp.*, 943 F.3d 758, 766 n.2 (5th Cir. 2019) citing *In re Energy Future Holdings Corp*., 540 B.R. at 124.

81.      Here, equity demands payment of the contract rate. When addressing the analogous question of equitable factors that might affect an oversecured creditor's right to contract rate interest, courts consider the following factors: (i) whether the creditor engaged in misconduct or unjust delay; (ii) whether application of the contractual interest rate would harm unsecured creditors; (iii) whether the contractual interest rate constitutes a penalty; and (iv) whether an award of interest at the contract rate would impair the debtor's fresh start. *See In re Gen. Growth Props*.,

*Inc.*, 2011 WL 2974305, at *4 (Bankr. S.D.N.Y. July 20, 2011). All of those factors point firmly in the direction of awarding the contract rate.

82.     *First*, there is no evidence of any misconduct or unjust delay. To the contrary, the Senior Noteholders worked diligently and expeditiously to meet every deadline and enable the Company to exit bankruptcy unopposed on its ambitious timetable. As counsel for the Debtors' acknowledged at the confirmation hearing, without the Senior Noteholders' willingness to put their money where their mouth is at the auction and "compet[e] so hard to win the right to invest in the Company . . . the result would have been far less favorable." June 10, 2021 Hr'g Tr. 10:7–11.

83.     *Second*, payment of the contract rate will not harm other creditors of the estate. Every creditor of the estate is deemed unimpaired under the Plan and will recover in full. Indeed, the Debtors have repeatedly stated on the record that they are capable of paying postpetition interest at the contract rate while also paying all other creditors of the estate in full and distributing more than $1 billion of value to equityholders. *See* May 14, 2021 Hr'g Tr. 31:1–6 ("[T]o the extent that there's a determination that post-petition interest, that make-whole or fees . . . are owed, they will be paid all as necessary for the treatment of their claims to be unimpaired under the code.").

84.     *Third*, there is no evidence that the contract rate is punitive. The interest rates prescribed by the Senior Notes Indentures reflect the bargained-for consideration the Debtors agreed to pay their creditors in exchange for the loan.

85.     *Fourth*, payment of the contract rate will not impair the Debtors' fresh start. The Debtors will emerge from bankruptcy with more than $1 billion in cash on their balance sheet and a $1.5 billion revolving credit facility. With liquidity in excess of $2.5 billion, the Debtors (as they have repeatedly represented on the record) can easily afford the comparatively modest sum of $128 million accrued in postpetition interest at the contract rate.

86.     The Plan proposes to distribute, among other things, $240 million in cash to equityholders, which alone dwarfs the amount of postpetition interest the Senior Noteholders seek to recover. It would offend the principles of fairness and equitable distribution of estate assets underlying the Bankruptcy Code to demand that Senior Noteholders provide a solvent debtor a 13-month interest-free loan to finance such a massive windfall for equityholders.

## CLAIMS FOR RELIEF

### COUNT ONE
**(Section 1124(1) - Declaratory Judgment that the Debtors Must Pay the Redemption Price)**

87.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

88.     The Plan provides that the Senior Notes claims shall be "fully preserved" against the Defendants in the amounts required to render the Senior Notes claims unimpaired within the meaning of Section 1124 of the Bankruptcy Code.

89.     Section 1124(1) states that a claim may be deemed "unimpaired" under a plan only when the plan "leaves unaltered the legal, equitable, and contractual rights to which such claim . . . entitles the holder of such claim." 11 U.S.C. § 1124(1).

90.     The Senior Notes Indentures require payment of the contractually specified Redemption Price if the Debtors choose to redeem the Senior Notes before their maturity dates.

91.     Upon the Effective Date, Defendants will effect a voluntary redemption of the Senior Notes by repaying the Senior Notes in full in cash prior to their respective maturity dates.

92.     This voluntary redemption triggers the Debtors' obligation to pay the Redemption Price, which is not prohibited under the Bankruptcy Code.

93.     The Senior Notes Indentures further provide that if the Redemption Price for any Senior Note called for redemption shall not be paid in full upon surrender of the note for redemption, the principal and premium shall, until paid, bear interest from the Redemption Date

at the rate borne by the respective Senior Notes ("Default Interest"). Such Default Interest will begin to accrue on unpaid amounts on the Plan's Effective Date, which is when the Senior Notes are redeemed.

94.     Accordingly, Defendants owe, and the holders of the 2022 Notes are entitled to payment of, a Redemption Price of no less than $13,936,491, plus Default Interest at the rate prescribed in the 2022 Notes. The Defendants owe, and the holders of the 2024 Notes are entitled to payment of, a Redemption Price of no less than $36,472,571, plus Default Interest at the rate prescribed in the 2024 Notes Indenture. The Defendants owe, and the holders of the 2026 Notes are entitled to payment of, a Redemption Price of no less than $82,280,108, plus Default Interest at the rate prescribed in the 2026 Notes Indenture. The Defendants owe, and the holders of the 2028 Notes are entitled to payment of, a Redemption Price of no less than $138,995,550, plus Default Interest at the rate prescribed in the 2028 Notes Indenture.

95.     Defendants dispute that any of the Redemption Price is due, and the terms of the Plan reflect such position. Thus, an actual, justiciable controversy exists between Defendants and Plaintiff. Issuance of a declaratory judgment would resolve that controversy.

### COUNT TWO
**(Section 1124(1) - Declaratory Judgment that the Debtors Must Pay Postpetition Interest at the Rate Prescribed in the Senior Notes Indentures)**

96.     Plaintiff incorporates all preceding paragraphs as if fully re-alleged herein.

97.     The Plan provides that the Senior Notes claims shall be "fully preserved" against the Defendants in the amounts required to render the Senior Notes claims unimpaired within the meaning of Section 1124 of the Bankruptcy Code.

98.     Section 1124(1) states that a claim may be deemed "unimpaired" under a plan only when the plan "leaves unaltered the legal, *equitable,* and contractual rights to which such claim . . . entitles the holder of such claim." 11 U.S.C. § 1124(1) (emphasis added).

99.     Under the circumstances of this case, if Defendants are not required to pay the Redemption Price, then equity demands that the Senior Noteholders be paid postpetition interest at the rate prescribed in the Senior Notes Indentures. The Debtors are solvent and will distribute more than $1 billion of value to equityholders. The Senior Noteholders that were part of the Ad Hoc Group worked diligently and expeditiously to meet every deadline and enable the Company to exit bankruptcy on its ambitious timetable, and contributed significant value to the Company's ultimate success. Payment of the contract rate will not impair the rights of any creditors of the estate nor the Company's successful post-emergence operations. Indeed, the Debtors can afford to pay the contract rate with cash on hand. The general equitable rule is that creditors of a solvent debtor have a presumptive right to payment of interest at the contract rate absent inequitable or unconscionable result.

100.     Accordingly, if Count One is not granted, then Defendants owe, and the holders of the 2022 Notes are entitled to payment of, postpetition interest in an amount of no less than $13,936,491, plus prejudgment interest at New York's statutory rate of 9%. Defendants owe, and the holders of the 2024 Notes are entitled to payment of, postpetition interest in an amount of no less than $24,895,401, plus prejudgment interest at New York's statutory rate of 9%. Defendants owe, and the holders of the 2026 Notes are entitled to payment of, postpetition interest in an amount of no less than $34,634,678, plus prejudgment interest at New York's statutory rate of 9%. Defendants owe, and the holders of the 2028 Notes are entitled to payment of, postpetition interest in an amount of no less than $51,046,083, plus prejudgment interest at New York's statutory rate of 9%.

101.     Defendants dispute that the contract rate of interest is due, and the terms of the Plan reflect such position. Thus, an actual, justiciable controversy exists between Defendants and

Plaintiff. Issuance of a declaratory judgment would resolve that controversy.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests that the Court:

a)   Enter judgment declaring that Defendants are obligated to pay the Trustee, for the benefit of the Senior Noteholders, the Redemption Price in the amounts specified in Count One above, or such greater or lesser amounts as the Bankruptcy Code may permit.

b)   Enter judgment declaring that Defendants are obligated to pay the Trustee, for the benefit of the Senior Noteholders, postpetition interest in the amounts specified in Count Two above, or such greater or lesser amounts as the Bankruptcy Code may permit.

c)   Grant Plaintiff such further relief as the Court deems appropriate.

*[remainder of page intentionally left blank]*

Dated: July 1, 2021

     Wilmington, Delaware

           WILLKIE FARR & GALLAGHER LLP

               Rachel C. Strickland (*pro hac vice*)
               Daniel I. Forman (*pro hac vice*)
               Agustina G. Berro (*pro hac vice*)

               787 Seventh Avenue
               New York, New York 10019
               Telephone: (212) 728-8000
               Facsimile: (212) 728-8111
               Email: rstrickland@willkie.com
                     dforman@willkie.com
                     aberro@willkie.com

          -and-

           WILLKIE FARR & GALLAGHER LLP

               Mark T. Stancil (*pro hac vice*)

               1875 K Street, N.W.
               Washington, DC 20006
               Telephone: (212) 728-8000
               Facsimile: (212) 728-8111
               Email: mstancil@willkie.com

          -and-

           YOUNG CONAWAY STARGATT & TAYLOR LLP

          By: */s/ Edmon L. Morton*
               Edmon L. Morton, Esq. (No. 3856)
               Matthew B. Lunn, Esq. (No. 4119)
               Joseph M. Mulvihill (No. 6061)

               Rodney Square
               1000 North King Street
               Wilmington, Delaware 19801
               Telephone: (302) 571-6600
               Facsimile: (302) 571-1253
               Email: emorton@ycst.com
                     mlunn@ycst.com
                     jmulvihill@ycst.com

           *Counsel to Wells Fargo Bank, N.A., as Indenture Trustee*
           *and the Ad Hoc Group of Hertz Bondholders*

-and-

FOLEY & LARDNER LLP

Harold L. Kaplan
Mark F. Hebbeln (*pro hac vice*)

321 North Clark Street, Suite 3000
Chicago, Illinois 60654
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
Email: hkaplan@foley.com
       mhebbeln@foley.com

*Counsel to Wells Fargo Bank, N.A., as Indenture Trustee*