**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| THE HERTZ CORP., et al., | ) | |
| | ) | Case No. 20-11218 (MFW) |
|        Debtors. | ) | Jointly Administered |
| _____ | ) | |
| | ) | |
| WELLS FARGO BANK, N.A., as | ) | |
| INDENTURE TRUSTEE, | ) | |
| | ) | |
|        Plaintiffs, | ) | |
| | ) | |
|        -and- | ) | |
| | ) | |
| US BANK, as INDENTURE TRUSTEE, | ) | |
| | ) | |
|        Intervenor-Plaintiff, | ) | |
| | ) | |
|    v. | ) | Adv. No. 21-50995 (MFW) |
| | ) | |
| THE HERTZ CORP., et al., | ) | |
| | ) | Rel. Docs. 5, 15, 16, 17 |
|        Defendants. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION**[1]

     Before the Court is the Debtors' Motion to Dismiss the complaint filed by the Indenture Trustees, on behalf of the holders of a series of unsecured notes issued by the Debtors pre-petition (the "Noteholders"), for recovery of a redemption premium and/or post-petition interest allegedly due under the Notes.  For the reasons stated below, the Court will grant in

---

[1]    The Court is not required to state findings of fact or conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.  Instead, the facts recited are those averred in the Complaint, which must be accepted as true for the purposes of the Motion to Dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

part and deny in part the Debtors' Motion to Dismiss the
redemption premium count and grant the Debtors' Motion to Dismiss
the post-petition interest count.

I.    BACKGROUND

On May 22, 2020, the Hertz Corporation and its affiliates
(collectively "the Debtors") filed voluntary petitions under
chapter 11 of the Bankruptcy Code.  The filing was due in large
part to the disruption caused to travel and its business
operations by the Covid-19 pandemic.  (D.I. 28 ¶¶ 3-9.)[2]  After a
downsizing of their fleet and a sale of a non-core part of their
business, the Debtors obtained an offer from a proposed plan
sponsor.  After designating a stalking horse bidder and
conducting an auction process, the Debtors selected a winning
bidder and filed the Second Modified Third Amended Plan of
Reorganization ("the Plan") to effectuate a reorganization in
accordance with that bid.  (D.I. 5178.)  The Plan provided
generally for payment in full in cash on the effective date to
creditors plus post-petition interest to the effective date at
the federal judgment rate or in the amount necessary to render
them unimpaired and a distribution to shareholders of cash and
new warrants or subscription rights.  (Id. at Art. III.B.)  The

---

[2]    References to the docket in this adversary proceeding
are to "Adv. D.I. #" while references to the docket in the
main case are to "D.I. #."

Plan was accepted by the shareholders.  (D.I. 5181.)  On June 10,
2021, the Court confirmed the Plan.  (D.I. 5261.)  The
Confirmation Order preserved the rights of the Noteholders to
assert entitlement to a make-whole premium and additional
interest and other claims as necessary to render their claims
unimpaired, as well as the Debtors' right to object to those
claims.  (Id. at ¶¶ 26 & 27.)  The Plan went effective on June
30, 2021 (the "Effective Date").  (D.I. 5477.)

On July 1, 2021, Wells Fargo Bank, N.A. ("Wells Fargo"), as
Indenture Trustee for a series of unsecured notes issued by the
Debtors pre-petition (the "Senior Notes"), filed a complaint
seeking a declaratory judgment that, in addition to the principal
and pre-petition interest paid to the Senior Noteholders on the
Effective Date (in excess of $2.7 billion), the Debtors must pay
approximately $272 million consisting of (1) a make-whole premium
due under the Senior Notes (totaling approximately $147 million)
and (2) post-petition interest on their claims at the contract
default rate in excess of the federal judgment rate
(approximately $125 million).  (Adv. D.I. 1 at Ex. A.)  US Bank,
N.A. ("US Bank"), as Indenture Trustee for the 7% Unsecured
Promissory Noteholders, intervened as a plaintiff seeking relief
only on the second claim.  (Adv. D.I. 14.)

On August 2, 2021, the Debtors filed a Motion to Dismiss
both counts for failure to state a claim.  The Motion was fully

3

briefed and oral argument was held on November 9, 2021. The
matter is ripe for decision.


II.  JURISDICTION

The Court has subject matter jurisdiction over this
adversary proceeding.  28 U.S.C. §§ 157, 1334.  The Court has the
power to enter a final judgment in this adversary because it
concerns the allowance of claims against the estate.  28 U.S.C. §
157(2)(A) & (O).  Stern v. Marshall, 564 U.S. 462, 499 (2011).
In addition, the parties have consented to entry of a final order
by this Court.  (Adv. D.I. 1 at ¶ 39, 5 at ¶12 & 14 at ¶ 15.)
Wellness Int'l Network, Ltd. v. Sharif, 575 U.S. 665 (2015)
(holding that even where Article III concerns would preclude the
bankruptcy court from entering final judgment over a party's
opposition, a court may do so if the parties consent).


III. DISCUSSION

A.  Standard of Review

A Rule 12(b)(6) motion challenges the sufficiency of the
factual allegations in the complaint.  Kost v. Kozakiewicz, 1
F.3d 176, 183 (3d Cir. 1993).  To survive a motion to dismiss,
the complaint must contain sufficient factual matter, accepted as
true, "to state a claim to relief that is plausible on its face."
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is

facially plausible when "the plaintiff pleads factual content
that allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." <u>Ashcroft v.
Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Twombly</u>, 550 U.S. at
556).  The court must draw all reasonable inferences in favor of
the plaintiff.  <u>E.g.</u>, <u>Alpizar-Fallas v. Favero</u>, 908 F.3d 910, 914
(3d Cir. 2018).

In weighing a motion to dismiss, the court should undergo a
three-part analysis.  "First, the court must take note of the
elements needed for a plaintiff to state a claim." <u>Santiago v.
Warminster Twp.</u>, 629 F.3d 121, 130 (3d Cir. 2010) (citing <u>Iqbal</u>,
556 U.S. at 675).  Second, the court must separate the factual
and legal elements of the claim, accepting all of the complaint's
well-pled facts as true and disregarding any legal conclusions.
<u>Id.</u>; <u>Fowler v. UPMC Shadyside</u>, 578 F.3d 203, 210 (3d Cir. 2009)
(citing <u>Iqbal</u>, 556 U.S. at 679).  Third, the court must determine
whether the facts alleged in the complaint are sufficient to show
that the plaintiff has a plausible claim for relief.  <u>Santiago</u>,
629 F.3d at 130.

The Court may consider documents to which the complaint
refers if they are central to the claim and no party questions
their authenticity.  <u>Marder v. Lopez</u>, 450 F.3d 445, 448 (9th Cir.
2006).  <u>See also</u> <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153
n.3 (2d Cir. 2002).

B.    <u>Redemption Premium</u>

In Count 1 of the Complaint, Wells Fargo seeks a declaratory judgment that the Debtors must pay the redemption premium provided in the Senior Notes because they were redeemed prior to their maturity.

The Debtors seek to dismiss this count for failure to state a claim asserting that (a) no redemption premium is allowed under the express language of the Indentures or (b) the redemption premium is unmatured interest which must be disallowed under the Bankruptcy Code.  Wells Fargo disputes both of these contentions.

1.    <u>Terms of the Indentures</u>[3]

a.    <u>Acceleration Clause</u>

The Debtors rely initially on section 602 of the Indentures which provides that upon the filing of a bankruptcy petition the Senior Notes are automatically accelerated and "the principal of and accrued but unpaid interest on all Outstanding Notes of such series will <u>ipso</u> <u>facto</u> become immediately due and payable without any declaration or other act on the part of the Trustee or any Holder."  Because section 602 does not provide for the payment of any redemption premium on acceleration, the Debtors contend that none is due.

---

[3]    The Indentures and Supplemental Indentures for the Senior Notes contain substantially identical terms for purposes of the issues at bar.  (Adv. D.I. 5 at Exs. A-H.)

Wells Fargo responds that the Debtors' argument must be rejected based on controlling Third Circuit precedent. In re Energy Future Holdings Corp., 842 F.3d 247 (3d Cir. 2016) (hereafter "EFH"). In EFH, Wells Fargo contends, the Third Circuit considered similar language in acceleration clauses under New York law[4] and concluded that the issue of whether a redemption premium was due depended not on the terms of the acceleration clause, but on the terms of the redemption provision. 842 F.3d at 257-60.

The Debtors seek to distinguish EFH by noting that the language in the two series of notes at issue in that case provided that on acceleration all "outstanding Notes" were due or all "principal, interest, and applicable premium" were due. Id. at 254, 257. Therefore, they assert that the Third Circuit held that the acceleration clause and the redemption provision were not in conflict. Id. at 256. In contrast, they contend that the acceleration clause in this case, which provides for payment only of "the principal of and accrued but unpaid interest," cannot be read in harmony with the redemption provision which requires payment of an additional premium.

The Court finds that argument is a distinction without significance. While the Third Circuit rejected the EFH debtor's

---

[4]    The Indentures in this case are also governed by New York law.  (Adv. D.I. 5, Exs. A & C, § 115, Exs. E & G, § 113.)

argument that the acceleration and redemption provisions in that case were in conflict, it concluded that the two sections "simply address different things: § 6.02 causes the maturity of EFHI's debt to accelerate on its bankruptcy, and § 3.07 causes a make-whole to become due when there is an optional redemption before" the maturity date.  Id.  The Third Circuit concluded that the redemption provision "is the only provision that specifically addresses redemption."  Id.  That conclusion applies to the Senior Notes in this case, as well.  Therefore, the Court concludes that the acceleration clause in the Indentures is not the operative provision in determining whether the redemption premium is due.

### b.   Redemption Provision

The Debtors argue that, even under the language of the redemption provision, no redemption premium is due on the Senior Notes for several reasons.

### i.   At the Debtors' Option

The Debtors argue, initially, that for any redemption premium to be due, the redemption must have been "at the [Debtors'] option."[5]  They contend that the Senior Notes were not redeemed at the Debtors' option.  They assert that they were forced to file bankruptcy because of the collapse of their business due to the pandemic.  The Debtors argue that, upon the

---

[5]    Adv. D.I. 5, Exs. B, D, F, H at § 6.

bankruptcy filing, the Senior Notes were automatically accelerated and required to be paid in full.  E.g., In re MPM Silicones, L.L.C., 874 F.3d 787, 803 (2d Cir. 2017) (holding that payment was mandated by acceleration of the notes on the filing of bankruptcy and therefore that payment was not a voluntary redemption by the debtor).

Wells Fargo disagrees, arguing that the MPM case on which the Debtors rely is contrary to the decision in EFH which is binding on this Court.  It argues that the Third Circuit in EFH specifically concluded that the automatic acceleration caused by a bankruptcy filing did not make any later redemption non-voluntary.  EFH, 842 F.3d at 255.

The Court agrees with Wells Fargo.  The Third Circuit in EFH expressly held that the mere acceleration of notes as a result of a bankruptcy filing does not mean that the debtor in that case could not be liable for a redemption premium upon subsequently redeeming the notes.  Id.  Although MPM is to the contrary, it is not the law in this Circuit.  The Third Circuit in EFH disagreed with the bankruptcy court's decision which was upheld in MPM and distinguished the AMR decision (on which the Second Circuit relied in MPM).  842 F.3d at 258-60 (citing In re AMR Corp., 730 F.3d 88 (2d Cir. 2013)).

The Debtors assert, nonetheless, that EFH is distinguishable because, unlike the debtor in that case, they did not file

bankruptcy in a strategic effort to avoid the payment of a
redemption premium.  Id. at 251.[6]

Wells Fargo disagrees, noting that there is nothing in EFH
requiring an intent to avoid the make-whole obligation in order
to find that a redemption of notes is voluntary.  Wells Fargo
argues that no court has held that if an issuer does not have an
intent to avoid the redemption provision, its action is not
voluntary.  Instead, Wells Fargo asserts that the cases which
find a redemption involuntary are predominately cases where the
acceleration was at the lenders' option.[7]

The Court agrees with Wells Fargo.  The EFH Court did not
conclude that the voluntariness of the redemption was dependent
on a finding that the debtor filed bankruptcy to avoid the
obligation to pay the noteholders a redemption premium.  Instead,
the Third Circuit found that the debtor had filed a voluntary
petition in bankruptcy and once in bankruptcy, had the option to

_____

[6]    See also Sharon Steel Corp. v. Chase Manhattan Bank,
N.A., 691 F.2d 1039, 1053 (2d Cir. 1982) (enforcing make-whole
where debtor filed a voluntary plan of liquidation in an attempt
to substitute the buyer for the debtor as obligor under low-
interest debentures); Wilmington Sav. Fund Soc'y v. Cash Am.
Int'l, Inc., No. 15-CV-5027 (JMF), 2016 WL 5092594, at *7
(S.D.N.Y. Sept. 19, 2016) (enforcing make-whole where issuer
breached indenture in connection with a spinoff).

[7]    E.g., In re Granite Broad. Corp., 369 B.R. 120, 144
(Bankr. S.D.N.Y. 2007) (citing In re LHD Realty Corp., 726 F.2d
327, 330 (7th Cir. 1984)).  See also EFH, 842 F.3d at 260 (noting
that "by electing to accelerate the debt, a lender forgoes its
right to a stream of payments in favor of immediate repayment"
and cannot claim a redemption premium).

10

reinstate the notes.  EFH, 842 F.3d at 255.  The other cases

cited by the Debtors are similarly distinguishable.[8]  In fact,

several cases have found a redemption voluntary even where the

issuer acted in the utmost good faith.[9]

Finally, the Debtors argue that any option to reinstate the

Senior Notes was hypothetical at best.  They contend that they

could not continue to operate without filing bankruptcy because

they lost over 90% of their revenues as a result of the pandemic.

Further, they argue that they had no ability to formulate a plan

that reinstated the Senior Notes because they received no offers

that allowed that option.  Rather, the Debtors assert that, once

in bankruptcy, they had a fiduciary duty to accept the highest

and best bid they received at the auction, which precluded the

reinstatement of the Senior Notes.  Therefore, the Debtors argue

that the repayment of the Senior Notes pursuant to the terms of

---

[8]    E.g., Sharon Steel, 691 F.2d at 1053 (simply holding
that where issuer breached the indenture, the trustee had the
option to enforce the redemption provision rather than accelerate
the notes); WSFS, 2016 WL 5092594, at *7 (concluding that cases
interpreting Sharon Steel as requiring bad faith intent to avoid
redemption premium were incorrect and no such intent was
necessary to allow enforcement of redemption clause).

[9]    E.g., Chesapeake Energy Corp. v. Bank of N.Y. Mellon
Tr. Co. N.A., 837 F.3d 146 (2d Cir. 2016) (enforcing redemption
provision even though company acted in good faith, in reliance on
a declaratory judgment, later reversed on appeal, that its
actions would not trigger the provision); In re Imperial Coronado
Partners, Ltd., 96 B.R. 997, 1000 (9th Cir. BAP 1989) (concluding
that decision to sell property was voluntary even though debtor
did not have the financial means to reinstate the note and the
sale made good business sense).

the Plan was not a redemption "at the Company's option" which is necessary to trigger the requirement to pay the redemption premium.

Wells Fargo argues that the Debtors' bankruptcy filing was a strategic, voluntary decision and that the Debtors had many options for restructuring their obligations once in bankruptcy, including specifically the choice to reinstate the Senior Notes. 11 U.S.C. § 1124(2).  It, therefore, contends that the Plan which was filed by the Debtors and ultimately confirmed was a redemption of the Senior Notes at the Debtors' option.

The Court agrees with Wells Fargo.  The Third Circuit found, in concluding that the redemption of notes in EFH was voluntary, that the debtor there "filed for Chapter 11 protection voluntarily.  Once there, it had the option, per its plan of reorganization, to reinstate the accelerated notes' original maturity date under Bankruptcy Code § 1124(2) rather than paying them off immediately.  It chose not to do so."  EFH, 842 F.3d at 255.

Similarly, in this case the Debtors filed a voluntary petition in bankruptcy.  It was perhaps the best option for the Debtors in light of the drastic effects on their business caused by the pandemic, but it was not the only option.  Further, while the Debtors chose to conduct an auction for a plan sponsor and ultimately selected the highest and best offer, that too was not

12

the Debtors' only option.  At numerous junctures in any
bankruptcy case, a debtor in possession has multiple paths from
which to choose.  That the Debtors here chose a path that
resulted in a fantastic result for all of their creditors and
shareholders does not mean that it was not a voluntary choice.
Even though the Debtors acted in good faith and in the
fulfillment of their fiduciary duties, the Court concludes that
their actions were voluntary.  As noted above, courts have found
that even actions taken in good faith and in fulfillment of a
debtor's fiduciary duty can be voluntary resulting in liability
for a redemption premium.  See cases discussed in note 9, supra.

        Therefore, the Court concludes that Wells Fargo has alleged
sufficient facts which, accepted as true, state a facially
plausible claim that the redemption of the Senior Notes was at
the Debtors' option.  Twombly, 550 U.S. at 570.

### ii.  Applicability of Section 6(a)

        The Debtors further argue that, even if the redemption is
determined to be voluntary, no redemption premium is due under
the express terms of the Indentures because they were redeemed
after they matured upon the bankruptcy filing.  The Debtors rely
preliminarily on section 6(a) of the Supplemental Indentures
which provides that the "[Senior] Notes will be redeemable, at
the Company's option, in whole or in part, at any time and from
time to time on or after [a specified date] and prior to maturity

thereof at the applicable redemption price set forth below."
(Adv. D.I. 5, Exs. B, D, E & G (emphasis added).)

a.   <u>2022/2024 Senior Notes</u>

Wells Fargo concedes that section 6(a) is the provision
applicable to the 2022/2024 Senior Notes.  It argues, however,
that the term "prior to maturity" in section 6(a) means prior to
the original maturity date of the Senior Notes in 2022 and 2024.
Because the Debtors redeemed the Senior Notes before the date
that they were due to mature, Wells Fargo contends that the
redemption premium is due.

The Debtors respond that the Indentures contained a defined
term (the "Stated Maturity") for the date when each of the series
of Senior Notes was originally due.  They argue that the failure
to use that defined term in section 6(a) establishes that the
phrase "prior to maturity" must mean something broader than that
specific date.  They cite several other sections of the
Indentures which distinguish Stated Maturity from maturity
arising "on acceleration" or "otherwise."  (Adv. D.I. 5, Exs. A,
C, E, G at §§ 1301(a), 601(ii), 301(6).)  The Debtors also argue
that if "prior to maturity" simply meant the Stated Maturity
date, that it would have been unnecessary (and mere surplusage)[10]

---

[10]   <u>E.g.</u>, <u>Burlington Ins. Co. v. NYC Transit Auth.</u>, 79
N.E.3d 477, 482 (N.Y. 2017) (holding that courts should interpret
contracts in a manner that does not render a portion of a
provision superfluous or meaningless).

to include the term at all because the chart in section 6(a) makes reference to what premium is due at all times prior to the Stated Maturity date.

The Court agrees with the Debtors' analysis. The date when the Senior Notes are due is a defined term, Stated Maturity. If section 6(a) was meant to apply only to redemptions before the Stated Maturity date, rather than prior to a maturity caused by some other event, such as a bankruptcy filing, it would have used the term Stated Maturity. Further, if the phrase simply meant redemption prior to the Stated Maturity it would have been surplusage, because the chart included in that section stated what needed to be paid at any time before the Stated Maturity date.

Accordingly, the Court concludes that the undefined term "maturity" in section 6(a) must refer to the common meaning of maturity, which under the terms of the Senior Notes includes upon the acceleration caused by a bankruptcy filing. E.g., Sapp v. Indus. Action Servs., LLC, C.A. No. 19-912-RGA, 2020 WL 2813176, at *3 (D. Del. May 29, 2020) ("[W]hen the same term appears in different sections of the agreement and is capitalized in one section but not the other, the non-capitalized term will have its 'ordinary, plain meaning.'") (citing Derry Finance N.V. v. Christiana Cos., 797 F.2d 1210, 1214 (3d Cir. 1986)). This interpretation is confirmed by sections 601(ii) and 301(6) of the

Indentures which use the lower case term "maturity" in reference to acceleration of the Senior Notes on bankruptcy or a default.

Therefore, under the express terms of section 6(a) of the redemption provision, the Court concludes that Wells Fargo has failed to state a plausible claim that a redemption premium is due on the 2022/2024 Senior Notes because they were redeemed after the initial period stated therein but not prior to the maturity arising as a result of the bankruptcy filing. Therefore, the Court will grant the Motion to Dismiss Count 1 as to the 2022/2024 Senior Notes.

b.   2026/2028 Senior Notes

The Debtors argue that the same result applies to the Senior Notes originally due to mature in 2026 and 2028.

Wells Fargo responds that section 6(a) is not applicable to those Senior Notes because they were <u>not</u> redeemed "on or after" the date specified in that section.  Instead, it contends that section 6(c) governs, which provides that "At any time prior to [the specified date], the [Senior Notes] may also be redeemed (by the Company or any other person) in whole or in part, at the Company's option, at . . . the Redemption Price . . . ."

The Debtors assert, however, that section 6(a) is incorporated in full into section 6(c) because the latter provides circumstances under which the Senior Notes may "also" be redeemed.

16

Wells Fargo responds that if "also" meant that all of section 6(a) was incorporated into section 6(c) then there would have been no need to repeat provisions from section 6(a) in section 6(c) such as "at the Company's option" and "in whole or in part."

The Court agrees with Wells Fargo that the use of "also" in section 6(c) does not mean that all of section 6(a) is incorporated into section 6(c).  If it did, section 6(c) would contain surplusage, which is to be avoided in contract interpretation.  E.g., Burlington Ins., 79 N.E.3d at 482.  It would also create an internal contradiction: section 6(a) is only applicable if redemption occurs after a specified date, while section 6(c) applies only if redemption occurs before that date, and each section provides a different redemption price.  Rather than accept the Debtors' tortured reading, the Court reads section 6(c) as simply providing the Debtors with the ability to redeem under the circumstances in that section, in addition to their redemption rights under section 6(a).  While redemption under section 6(a) requires that it occur before maturity, section 6(c) contains no such requirement.

Therefore, the Court concludes that Wells Fargo has stated a plausible claim, under the express terms of section 6(c) of the redemption provision, that a premium would be due on the 2026/2028 Senior Notes because they were redeemed before the

17

initial period stated therein.

### 2.    Economic Equivalent of Interest

The Debtors argue that, even if the redemption premium is due under the terms of the 2026/2028 Senior Notes, however, it cannot be an allowed claim because section 502(b)(2) of the Bankruptcy Code expressly provides that any claim for unmatured interest must be disallowed.  Although that term is not defined in the Code, the Debtors assert that courts look to substance over form and have disallowed claims that are the "contractual equivalent" of future interest.[11]  The Debtors also note that, although the Third Circuit did not directly address this issue in EFH, it characterized a redemption premium as the "contractual substitute for interest lost on Notes redeemed before their expected due date."  842 F.3d at 251.[12]

---

[11]    E.g., In re Chateaugay Corp., 961 F.2d 378, 380 (2d Cir. 1992) (concluding that unamortized portion of original issue discount was unmatured interest disallowed by § 502(b)(2)); In re Doctors Hosp. of Hyde Park, Inc., 508 B.R. 697, 705-06 (Bank. N.D. Ill. 2014) (holding that yield maintenance premium was a liquidated damages provision in the nature of disallowable unmatured interest); In re Ridgewood Apts., 174 B.R. 712, 721 (Bank. S.D. Ohio 1994) (prepayment penalty could be disallowed as unmatured interest because it was meant to compensate lender for loss of interest income).  See also In re Ultra Petroleum Corp., 943 F.3d 758, 765 (5th Cir. 2019) (noting that make-whole premium could be unmatured interest and remanding to bankruptcy court for determination based on the unique dynamics of the case).

[12]    See also MPM, 874 F.3d at 802 (noting that a make-whole premium "was intended to ensure that the Senior-Lien Note holders received additional compensation to make up for the interest they would not receive if the Notes were redeemed prior to the maturity date.")

Wells Fargo argues that the redemption premium is not interest.  It contends that interest is a payment for the "use" of money, while the redemption premium is being paid to the Senior Noteholders for the Debtors' "failure to use" their money. Wells Fargo asserts that, unlike interest, the redemption premium does not accrue over time but is a fixed one-time charge upon redemption, and, unlike interest, the redemption premium is contingent: it is only due if the Debtors redeem the Senior Notes in accordance with the terms of the redemption provision.  Wells Fargo contends that the redemption premium is intended to compensate the Senior Noteholders for the uncertainty and potential losses incurred in reinvesting that money in a different market environment, which implicates numerous factors beyond simply the periodic payment of interest.  It argues that the majority of courts agree, holding that redemption premiums are not unmatured interest.[13]

---

[13]   E.g., In re Ultra Petroleum Corp., 624 B.R. 178, 188-95 (Bankr. S.D. Tex. 2020) (on remand, concluding that make-whole premium was not the economic equivalent of unmatured interest and not disallowed under § 502(b)(2)); In re School Specialty, Inc., Bank. No. 13-10125 (KJC), 2013 WL 1838513, at *5 (Bank. D. Del. 2013) (agreeing with Trico and holding that make-whole premium should not be disallowed as unmatured interest); In re Trico Marine Servs. Inc., 450 B.R. 474, 481 (Bank. D. Del. 2011) (reviewing cases and concluding that "Th[e] Court is persuaded by the soundness of the majority's interpretation of make-whole obligations, and therefore finds that the Indenture Trustee's claim on account of the Make-Whole Premium is akin to a claim for liquidated damages, not for unmatured interest."). See also 4 Collier on Bankruptcy ¶ 502.03 (16th ed 2021) (collecting cases).

While the cases cited by Wells Fargo are useful, the Court notes that there is a minority of courts who disagree.[14] Further, although the Third Circuit in <u>EFH</u> described a redemption premium as the "contractual substitute for interest lost on Notes redeemed before their expected due date," it was not addressing the issue of whether it could be characterized as such to preclude its payment under section 502(b)(2).  842 F.3d at 251, 253 n.1.  Similarly, while the Fifth Circuit in <u>Ultra Petroleum</u> suggested that some make-wholes may be the equivalent of unmatured interest, it did not decide whether the ones in that case were, instead remanding the issue to the bankruptcy court. 943 F.3d at 765.[15]

The Court is not prepared to conclude, as a legal matter, that make-wholes cannot be disallowed as unmatured interest as Wells Fargo, the cases it cites, and academics[16] suggest.

---

[14]    <u>E.g.</u>, <u>Doctors Hosp.</u>, 508 B.R. at 706 (disagreeing with the <u>Trico</u> analysis because liquidated damages may well include unmatured interest); <u>In re MPM Silicones LLC</u>, Bankr. No. 14-22503 (RDD), 2014 WL 4436335, at *17-18 (Bankr. S.D.N.Y. Sept. 9, 2014) (concluding that noteholders claim to a make-whole based on debtor's breach of no call provision was unmatured interest disallowed under § 502(b)(2)), <u>aff'd in part and rev'd in part on other grounds</u>, 874 F.3d 787 (2d Cir. 2017).

[15]    Although the Bankruptcy Court held on remand that make-whole premium was not unmatured interest, that decision is currently on appeal.  <u>Ultra Petroleum Corp. v. Ad Hoc Comm. of OpCo Unsecured Creditors</u>, Case No. 21-20008 (oral argument was held before the Fifth Circuit on 10/04/2021).

[16]    <u>See</u> Douglas Baird, <u>Making Sense of Make-Wholes</u>, 94 Am. Bankr. L.J. 567 (2020).

Calling a make-whole a contract right or a liquidated damages
provision does not answer the question of whether it is unmatured
interest.[17]  In deciding whether a charge is unmatured interest
"courts look to the economic substance of the transaction to
determine what counts as interest."  <u>Doctors Hosp.</u>, 508 B.R. at
705.  If it were enough to just label a make-whole claim
liquidated damages, damages for breach of contract, or a
"separate contract right" from the obligation to pay interest,
then a contract providing that on default or redemption "all
unmatured interest" would be immediately due and payable could
avoid the effect of section 502(b)(2) completely.  This is
contrary to the express provisions of the Code and, consequently,
the Court concludes that the characterization of a make-whole as
a contract right or liquidated damages is not dispositive.

Instead, the Court concludes that the determination of
whether the redemption premium that Wells Fargo seeks in this
case is, in fact, the economic equivalent of unmatured interest
is not a legal question, but is instead a factual one: namely
whether the redemption provision in the 2026/2028 Senior Notes is
actually the economic equivalent of unmatured interest.

In considering the actual language of the redemption premium
in this case, the Court finds it significant that it is

_____

[17]    <u>In re Long John Silver's Rests., Inc</u>., 230 B.R. 29, 33
n.4 (Bankr. D. Del. 1999) (quoting William Shakespeare,
<u>Romeo & Juliet</u>, Act II, scene ii).

calculated, in large part, on the present value of the unmatured interest due on the Senior Notes as of the Redemption Date.[18]   At oral argument, Wells Fargo presented a powerpoint that appeared to suggest, however, that the redemption provision was much less than a simple present value of the unmatured interest and very favorable to the Debtors because it is tied to the Treasury rate. That was, of course, merely argument and no evidence was presented to support that assertion.   Nor did the Debtors have an opportunity to rebut the assertion with any evidence.   Instead, the Debtors argued that the test is not whether the redemption

---

[18]    The Supplemental Indenture provides in relevant part that prior to the stated date, the Debtors may redeem the 2028 Senior Notes for a price "equal to 100.0% of the principal amount thereof plus the Applicable Premium (as defined below) as of, and accrued but unpaid interest, if any, to, but not including, the Redemption Date."   (Adv. D.I. 5, Ex. H, § 6(c)).   That section further defines the Applicable Premium to mean

> with respect to a 2028 Note at any Redemption Date, the greater of (i) 1.00% of the principal amount of such 2028 Note and (ii) the excess of (A) <u>the present value</u> at such Redemption Date, calculated as of the date of the applicable redemption notice, of (1) the redemption price of such 2028 Note on January 15, 2023 (such redemption price being that described in Section 6(a)), plus (2) <u>all required remaining scheduled interest payments</u> due on such 2028 Note through such date (excluding accrued and unpaid interest to the Redemption Date), computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (B) the principal amount of such 2028 Note on such Redemption Date, as calculated by the Company in good faith (which calculation shall be conclusive) or on behalf of the Company by such Person as the Company shall designate; provided that such calculation shall not be a duty or obligation of the Trustee.

(<u>Id.</u> (emphasis added)).

premium equals the unpaid interest but whether it is the economic equivalent of the interest which the Senior Noteholders will not receive because of the early redemption of the Senior Notes. Doctors Hosp., 508 B.R. at 705-06.

The presentation by Wells Fargo (and the language of the redemption provision itself), however, are sufficient to convince the Court that Wells Fargo has stated a plausible claim for relief.  Santiago, 629 F.3d at 130.  While the redemption premium clearly was not due until the redemption occurred on the Effective Date of the Plan and, therefore, was "unmatured" as of the petition date, the Court concludes that Wells Fargo may be able to present evidence that the redemption premium in the 2026/2028 Senior Notes is not, in fact, the economic equivalent of unmatured interest due under those Senior Notes.

Accordingly, the Court concludes that Count 1 of the Complaint states a claim that is plausible on its face that the Debtors must pay the redemption premium on the 2026/2028 Senior Notes but does not state a plausible claim that the Debtors must pay the redemption premium on the 2022/2024 Senior Notes. Accordingly, the Court will grant the Debtors' Motion to Dismiss Count 1 as to the 2022/2024 Senior Notes but deny the Debtors' Motion as to the 2026/2028 Senior Notes.

　　　3.　 Other Arguments

Wells Fargo also contends, however, that regardless of how

23

the redemption provision is characterized, that portion of the
Senior Noteholders' claim cannot be disallowed because the
Debtors treated their class as unimpaired in the Plan, thereby
precluding them from voting on the Plan.  As a result, Wells
Fargo contends that the Debtors cannot impair any of the Senior
Noteholders' legal, contractual, or equitable rights and must pay
the Senior Noteholders all that they are entitled to receive
under the Indentures and under equity.  11 U.S.C. § 1124(1).  The
failure to pay the Senior Noteholders their contractual
entitlement to the redemption premium, Wells Fargo contends,
impairs the Senior Noteholders' contractual and equitable rights.
It also argues that, because the Debtors were "wildly solvent"
(returning in excess of $ 1.5 billion to equity holders), the
Senior Noteholders are entitled to all of their contract rights
(including the make-whole even if it is unmatured interest) under
the "solvent debtor exception."

The Debtors argue that the "impairment" and the "solvent
debtor exception" arguments are relevant only if the make-whole
is determined to be unmatured interest.  If it is not unmatured
interest, then the Debtors apparently concede that it is not
impaired by the Code or by the Plan and is due to the Senior
Noteholders.

The Court agrees with the Debtors that it is only if the
redemption premium is determined to be the economic equivalent of

24

unmatured interest that Wells Fargo's other arguments would be relevant.  However, if it is unmatured interest, then the claim would be subject to the same analysis as the claims of all Noteholders' to post-petition interest.  Therefore, the Court considers the parties' arguments on impairment and the solvent debtor exception together below.

     C.   <u>Unmatured Interest</u>

In Count 2 of the Complaint, Wells Fargo and US Bank (collectively, the "Indenture Trustees") seek a declaratory judgment that the Noteholders are entitled to post-petition interest on their claims, from the petition date to the date they were paid in full, at the contract rate.  As noted above, Wells Fargo also asserts that to the extent the Court concludes that the make-whole claim is unmatured interest, the Senior Noteholders are nonetheless entitled to it under the express terms of the Indentures.

The Debtors seek to dismiss both the claim for post-petition interest and any claim for the redemption premium that is properly characterized as unmatured interest, contending that general unsecured claims for unmatured interest are disallowed under the Bankruptcy Code.  11 U.S.C. § 502(b).  They contend that at most the Noteholders are entitled to interest from the petition date to the date the claims were paid in full only at the federal judgment rate as allowed in section 726(a)(5).

25

1. <u>Unimpaired</u>

The Indenture Trustees contend, however, that the Noteholders were treated as unimpaired under the Plan and, therefore, their claims for post-petition interest and/or the redemption premium must be paid in accordance with the terms of the Indentures.  They rely on section 1124(1) which provides in relevant part that

> a class of claims or interests is impaired under a plan unless, with respect to each claim or interest of such class, the plan -
> (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest . . . .

11 U.S.C. § 1124(1).

The Debtors disagree.  Because any claim for unmatured interest is disallowed by operation of the Bankruptcy Code, rather than the Plan, the Debtors argue that the Noteholders' claims are not impaired.  <u>In re PPI Enters. (US), Inc.</u>, 324 F.3d 197, 204 (3d Cir. 2003) (holding that a creditor is unimpaired if it is the effect of the Bankruptcy Code that modifies its rights, not the debtor's plan).

The Indenture Trustees argue that <u>PPI</u> is distinguishable because it dealt with the effect of section 502(b)(6) rather than section 502(b)(2).  They assert that section 502(b)(6) imposes an absolute cap on a landlord's claim, while section 502(b)(2) is not absolute and, in fact, is not effective where the debtor is solvent as it is here (pursuant to sections 726(a)(5) and

1129(a)(7)).

The Court finds the distinction illusory.  Section 502(b) addresses the allowance of claims; sections 1129(a)(7) and 726(a)(5) address the treatment of claims where the debtor is solvent.  The Indenture Trustees are conflating the allowance of claims with the treatment of claims.  If one considers only the allowance issue, the Court concludes that section 502(b)(2) is as absolute as section 502(b)(6), because it disallows all unmatured interest on general unsecured claims.

It is true that in the rare solvent chapter 11 debtor case, some claims may be entitled to post-petition interest under sections 1129(a)(7) and 726(a)(5).[19]  However, those sections do not reinstate the creditors' contract or state law rights to unmatured interest that has been disallowed by section 502(b)(2).  Instead as discussed below, sections 1129(a)(7) and 726(a)(5) require the treatment of claims in accordance with the mandates of those sections which courts have concluded require the payment of post-petition interest only at the federal judgment rate.[20]

---

[19]    United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., 484 U.S. 365, 379 (1988).

[20]    E.g., In re Cardelucci, 285 F.3d 1231, 1234 (9th Cir. 2002) (concluding that post-petition interest on general unsecured claims is payable under sections 726(a)(5) and 1129(a)(7) only at the federal judgment rate, not at the contract rate); In re PG&E Corp., 610 B.R. 308, 315 (Bank. N.D. Cal. 2019) (same); In re Washington Mutual, Inc., 461 B.R. 200, 242 (Bank. D. Del. 2011) (same), vacated on other grounds, 2012 WL 1563880 (Bank. D. Del. Feb. 24, 2012).

In <u>Ultra Petroleum</u>, the creditors made the same argument as the Indenture Trustees do in this case.  They contended that they were impaired because the debtor's plan did not pay their make-whole amount or post-petition interest at their contract rate.  The Bankruptcy Court agreed.  <u>In re Ultra Petroleum Corp.</u>, 575 B.R. 361, 373 (Bank. S.D. Tex. 2017).  On direct appeal, the Fifth Circuit reversed, concluding that "[w]e agree with <u>PPI</u>, every reported decision identified by either party, and Collier's treatise.  Where a plan refuses to pay funds disallowed by the Code, the Code - not the plan - is doing the impairing." <u>Ultra Petroleum</u>, 943 F.3d at 762-64.

Following binding precedent in this Circuit (and the analysis of the Fifth Circuit with respect to claims similar to the Noteholders' claims), the Court concludes that any modification of the Noteholders' claim to unmatured interest or to the redemption premium (if it is the economic equivalent of unmatured interest) is an impairment of the Noteholders' contract claims by operation of section 502(b)(2) of the Bankruptcy Code, not the Debtors' Plan.  Consequently, the Noteholders' claims are not impaired within the meaning of section 1124(1).  <u>E.g.</u>, <u>PPI</u>, 324 F.3d at 204; <u>Ultra Petroleum</u>, 943 F.3d at 765; <u>PG&E</u>, 610 B.R. at 315.

    2.   <u>Solvent Debtor Exception</u>

The Indenture Trustees argue, nonetheless, that they are

entitled to their contract rate of interest under the equitable
doctrine known as the "solvent debtor exception."  They contend
that the Bankruptcy Code incorporated that equitable concept
which arose under the Bankruptcy Act and provided that creditors
were entitled to their full contract rights, if a debtor was
solvent.  The Indenture Trustees assert that the equities of this
case clearly support their claims: the Debtors are awash in cash,
paid all creditors in full, and provided a substantial return on
investment to equity (in cash and warrants).

      a.   <u>Express Terms of the Code</u>

The Debtors argue that equitable principles cannot override
express provisions of the Code, such as section 502(b)(2) which
disallows all unmatured interest on general unsecured claims,
without regard to whether a debtor is solvent.  They contend
that, while sections 726(a)(5) and 1129(a)(7)[21] require the
payment of post-petition interest on general unsecured claims
where the debtor is solvent, courts have held that the interest
is set at the federal judgment rate, not at the contract rate.[22]

---

[21]    11 U.S.C. §§ 726(a)(5) (providing payment of post-
petition interest at "the legal rate" to creditors, before any
distribution to the debtor (or equity), in the event there are
funds left after paying all other claims in a chapter 7
liquidation case), & 1129(a)(7) (providing that with respect to
each impaired class of claims or interests, each holder of such
claim has either accepted the plan or will receive at least what
it would have received in a liquidating chapter 7 case).

[22]    <u>E.g.</u>, <u>Cardelucci</u>, 285 F.3d at 1234; <u>PG&E</u>, 610 B.R. at
315; <u>Washington Mutual</u>, 461 B.R. at 242.

The Indenture Trustees respond that section 1129(a)(7) only incorporates section 726(a)(5) in chapter 11 cases with respect to impaired claims.  Because the Noteholders' claims are unimpaired under the Debtors' Plan, they assert that any limitation of post-petition interest to the federal judgment rate contained in those sections is not applicable to them.

The Court agrees with the Indenture Trustees, in part.  By their express terms, sections 1129(a)(7) and 726(a)(5) provide what treatment impaired creditors are entitled to receive, not what treatment unimpaired claims are entitled to receive in a solvent chapter 11 debtor case.  In essence, the Code is silent on what treatment unimpaired creditors must receive in a solvent chapter 11 debtor case.

b.   Repeal of § 1124(3)

The Indenture Trustees argue, however, that Congress has made it clear that unimpaired creditors are entitled to receive post-petition interest at their contract rate by its repeal of section 1124(3).  Before it was repealed, section 1124(3) had provided that a creditor is unimpaired if "the holder of such claim . . . receive[s] . . . cash equal to the allowed amount of such claim" on the effective date of the plan.  11 U.S.C. § 1124(3) (1988).  Its repeal was prompted by the decision of a Bankruptcy Court that because sections 726(a)(5) and 1129(a)(7) were only applicable to impaired creditors and because section

30

1124(3) required only the payment of the allowed amount of their claims, unimpaired creditors were not entitled to post-petition interest.  In re New Valley Corp., 168 B.R. 73, 79-81 (Bankr. N.J. 1994).  The Indenture Trustees contend that the Legislative History makes it clear that denial of post-petition interest to unimpaired creditors in the New Valley case was "unfair."[23] Thus, the Indenture Trustees conclude that the repeal of section 1124(3) makes it clear that unimpaired creditors must receive interest at their contract rate.

The Debtors argue that the repeal of section 1124(3) is irrelevant to the issue at hand.  They note that the repeal occurred before the Third Circuit's decision in PPI and did not affect its conclusion that creditors are unimpaired if their rights are altered by the Bankruptcy Code rather than the plan. PPI, 324 F.3d at 206-07.  Thus, they contend that the repeal of section 1124(3) does not alter the fact that section 502(b)(2) does not permit the payment of post-petition interest on the Noteholders' claim.

The Court disagrees with the Debtors' analysis of PPI.  The Third Circuit in PPI agreed with the bankruptcy court's conclusion in that case that the repeal of section 1124(3) meant that unimpaired creditors were entitled to the payment of post-

---

[23]    H.R. Rep. No. 103-835, at 48 (1994) (emphasis added), reprinted in 1994 U.S.C.C.A.N. 3340, 3356-57.

petition interest if the debtor was solvent.  <u>Id.</u>  However, the
Court does not read the repeal of section 1124(3) as expansively
as the Indenture Trustees to mandate that unimpaired creditors
must receive their contract rate of interest.  Congress explained
the repeal's effect, as follows:

> The principal change in this section is set forth
> in subsection (d) and relates to the award of
> postpetition interest.  In a recent Bankruptcy Court
> decision in <u>In re New Valley Corp.</u>, 168 B.R. 73 (Bankr.
> D.N.J. 1994), <u>unsecured creditors were denied the right
> to receive postpetition interest on their allowed
> claims even though the debtor was liquidation and
> reorganization solvent</u>. . . .  <u>In order to preclude
> this unfair result in the future</u>, the Committee finds
> it appropriate to delete section 1124(3) from the
> Bankruptcy Code.
> As a result of this change, if a plan proposed to
> pay a class of claims in cash in the full allowed
> amount of the claims, the class would be impaired,
> entitling creditors to vote for or against the plan of
> reorganization.  If creditors vote for the plan of
> reorganization, it can be confirmed over the vote of
> dissenting class of creditors only if it complies with
> the "fair and equitable" test under section 1129(b)(2)
> of the Bankruptcy Code and it can be confirmed over the
> vote of dissenting individual creditors only if it
> complies with the "best interests of creditors" test
> under section 1129(a)(7) of the Bankruptcy Code.
> <u>The words "fair and equitable" are terms of art
> that have a well established meaning under the case law
> of the Bankruptcy Act as well as under the Bankruptcy
> Code.  Specifically, courts have held that where an
> estate is solvent, in order for a plan to be fair and
> equitable, unsecured and undersecured creditors' claims
> must be paid in full, including postpetition interest,
> before equity holders may participate in any recovery.</u>

H.R. Rep. No. 103-835, at 48 (1994) (emphasis added), reprinted
in 1994 U.S.C.C.A.N. 3340, 3356-57.

Thus, in its repeal of section 1124(3), Congress did express its belief that the Bankruptcy Code contained an exception in cases where the debtor is solvent to the principle that creditors are not entitled to post-petition interest. The Legislative History, however, suggests that Congress believed that this solvent debtor exception is embodied in the "fair and equitable" and "best interests of creditors" tests contained in sections 1129(b) and 1129(a)(7).

While Congress stated that it would be unfair in a solvent chapter 11 debtor case for unimpaired creditors to receive no interest, it did not point to any provision of the Code that would allow interest to be paid to unimpaired creditors. Instead, it suggested that the failure to pay any interest to unsecured creditors in a solvent chapter 11 debtor would make them impaired and thus eligible to be paid interest by application of sections 1129(a)(7) and 1129(b)(2).

The Indenture Trustees argue, however, that Congress made it clear that unimpaired creditors under section 1124(1) would not be limited to the interest due under sections 1129(a)(7) and 726(a)(5).[24] While the Court agrees that Congress did state that

---

[24] H.R. Rep. 103-835, 48 (1994), reprinted in 1994 U.S.C.C.A.N. 3340, 3357 ("With respect to section 1124(1) and (2), subsection (d) would not change the beneficial 1984 amendment to section 1129(a)(7) of the Bankruptcy Code, which excluded from application of the best interests of creditors test classes that are unimpaired under section 1124.").

the repeal of section 1124(3) was not meant to modify the 1984 amendment to section 1129(a)(7) which excluded unimpaired creditors, the Court does not conclude that it was intended to suggest that any interest due to unimpaired creditors cannot be capped at the federal judgment rate applicable under section 726(a)(5).  Id.  The 1984 amendment to section 1129(a)(7) was made in conjunction with an amendment of section 1129(a)(10) to require the vote of "impaired" claims, rather than all claims.[25] The Legislative History to those amendments reveals that they were meant to require that debtors only need obtain the requisite vote (or satisfaction of the best interest of creditors test) with respect to "real" creditors, i.e., those impaired by the plan, rather than intended to assure that unimpaired creditors get more than the federal judgment rate in the case of the debtor's solvency.  See S. Rep. No. 98-65, at 80 (1983) ("Paragraph (10) makes clear the intent of section 1129(a)(10) that one "real" class of creditors must vote for the plan of reorganization.")

Nowhere in the repeal of section 1124(3) or its Legislative History did Congress state what the Indenture Trustees argue,

---

[25]    See An Act to amend title 28 of the United States Code regarding jurisdiction of bankruptcy proceedings, to establish new Federal judicial positions, to amend title 11 of the United States Code, and for other purposes, Pub. L. 98-353, § 512(a)(7) & (10), 98 Stat. 333 (1984) (amending 11 U.S.C. § 1129(a)(7) & (10)).

namely that unimpaired creditors must be paid their contract rate
of interest in a solvent chapter 11 debtor case.  Congress could
have so provided (1) by amending section 1124(3) to require that
unimpaired creditors receive their contract rate of interest, in
addition to payment in full of their allowed claim, or (2) by
amending section 502(b)(2) to provide that unmatured interest is
disallowed "except in the case of a solvent debtor."  It did
neither.

Thus, the repeal of section 1124(3) does not support the
Indenture Trustees' argument that an unimpaired creditor must
receive post-petition interest at its full contract rate.

c.   <u>Solvent Debtor Exception Cases</u>

The Indenture Trustees argue that, because there is no
express answer in the Bankruptcy Code or Legislative History, the
answer lies in the solvent debtor exception articulated by the
courts.  While that concept arose under the Bankruptcy Act, they
contend that it survives under the Bankruptcy Code because it has
not been repudiated by any of the provisions of the Code.  <u>E.g.</u>,
<u>Cohen v. de la Cruz</u>, 523 U.S. 213, 221 (1998) (interpreting
dischargeability provisions consistently with practice under the
Bankruptcy Act because the Court "will not read the Bankruptcy
Code to erode past bankruptcy practice absent a clear indication
that Congress intended such a departure").  The Indenture
Trustees assert that the solvent debtor exception (as articulated

35

by courts under the Act and the Code) mandates that, because the Debtors are solvent, all of the Noteholders' contract rights must be preserved, including the right to be paid post-petition interest at their contract rate.[26]

The Debtors contend that none of the Supreme Court cases cited by the Indenture Trustees support their contention, because they were all cases dealing with the entitlement of secured creditors to post-petition interest.[27]  The Debtors further argue that the Bankruptcy Code expressly incorporated the rulings of those cases in sections 506(b) and 1129(b)(2)(A).  They contend that cases granting secured creditors post-petition interest cannot be extended to unsecured creditors in the face of specific provisions of the Code, such as sections 502(b) and 506(b).  Law v. Siegel, 571 U.S. 415, 421 (2014) (holding that "equitable powers [that] remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code").

---

[26]   E.g., City of New York v. Saper, 336 U.S. 328, 330 n.7 (1949); Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156 (1946); Consolidated Rock Prods. Co. v. Dubois, 312 U.S. 510 (1941); Am. Iron & Steel Mfg. Co. v. Seaboard Air Line Ry., 233 U.S. 261, 264 (1914); In re Ultra Petroleum, 943 F.3d at 765; Gen. Elec. Capital Corp. v. Future Media Prods., Inc., 547 F.3d 956, 961 (9th Cir. 2008); In re Gencarelli, 501 F.3d 1, 7 (1st Cir. 2007); In re Dow Corning Corp., 456 F.3d 668, 679-80 (6th Cir. 2006); In re Terry Ltd. P'ship, 27 F.3d 241, 243 (7th Cir. 1994); In re Laymon, 958 F.2d 72, 75 (5th Cir. 1992).

[27]   Vanston Bondholders, 329 U.S. 156; Consolidated Rock, 312 U.S. 510; Am. Iron, 233 U.S. 261.

The Court agrees with the Debtors that cases cited by the Indenture Trustees which mandate the payment of interest to secured creditors at their contract rate when a debtor is solvent[28] are not applicable to the instant case which concerns unsecured creditors' rights.  Timbers of Inwood, 484 U.S. at 379 (holding that the right to post-petition interest provided under section 506(b) is not applicable to undersecured creditors but that, instead, section 726(a)(5) provides the rule for treatment of unsecured creditors in the rare solvent debtor case).

The other Supreme Court case cited by the Indenture Trustees is Saper, which is also not supportive of their argument.  City of New York v. Saper, 336 U.S. 328, 331 (1949) (holding that interest on tax claims, like other unsecured claims, stopped accruing on the bankruptcy filing date).  The Court in Saper relied on English law from which the Bankruptcy Act was derived and did note, albeit in dicta, that English law had an exception to that rule, in the event that a debtor was solvent.  Id. at 330 n.7 (1949).  The Supreme Court made no comment, however, on what post-petition interest was required by that exception.

Although the Indenture Trustees cite Circuit Court cases which hold that unsecured creditors in solvent chapter 11 debtor

---

[28]   Vanston Bondholders, 329 U.S. 156; Consolidated Rock, 312 U.S. 510; Am. Iron, 233 U.S. 261; GECC, 547 F.3d at 961; Gencarelli, 501 F.3d at 5, 8; Terry Ltd., 27 F.3d at 242-43; Laymon, 958 F.2d at 75;  Ruskin v. Griffiths, 269 F.2d 827, 830-832 (2d Cir. 1959).

cases are also entitled to post-petition interest at their contract rate, a closer reading of those cases show that many of them (1) relied on Supreme Court and other authority mandating such treatment for secured creditors, without explaining why it applies to unsecured creditors,[29] (2) relied on the fair and equitable test embodied in section 1129(b) which on its face is not applicable to unimpaired creditors,[30] and/or (3) expressly acknowledged that any right of an unsecured creditor to interest is subject to section 502(b).[31]

---

[29]    Dow Corning, 456 F.3d at 679 (relying on In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co., 791 F.2d 524, 528 (7th Cir. 1986), Ruskin, 269 F.2d at 831, and Debentureholders Protective Comm. of Cont'l Inv. Corp. v. Cont'l Inv. Corp., 679 F.2d 264, 269 (1st Cir. 1982)); Chicago, 791 F.2d at 528 (simply stating the solvent debtor exception applied to unsecured creditors without citation to any caselaw in support, while also acknowledging that "[t]he fact that a proceeding is equitable does not give the judge a free-floating discretion to redistribute rights in accordance with his personal views of justice and fairness, however enlightened those views may be."); Debentureholders, 679 F.2d at 269 (relying on Vanston, 329 U.S. 156 and Ruskin, 269 F.2d 827).

[30]    Dow Corning, 456 F.3d at 678-80 (ruling was premised on section 1129(b), because the court was considering the rights of impaired creditors, not unimpaired creditors, in a solvent chapter 11 debtor case).  Further, Dow Corning is contrary to the many cases that conclude that impaired creditors are only entitled to post-petition interest at the federal judgment rate under sections 1129(a)(7) and 726(a)(5).  E.g., Cardelucci, 285 F.3d at 1234; PG&E, 610 B.R. at 315; Washington Mutual, 461 B.R. at 242.

[31]    In Gencarelli, the First Circuit held that the contractual claims of unsecured creditors should be enforced in solvent chapter 11 debtor cases "unless one of the section 502 exceptions applies" and remanded the case to determine if any provision of that section did apply.  501 F.3d at 5, 8.

In a recent case, the Bankruptcy Court on remand in Ultra Petroleum also concluded that the passage of the Bankruptcy Code did not abolish the solvent debtor exception.  624 B.R. at 296-200.  The Ultra Petroleum Court determined that under that exception, unimpaired creditors in a solvent chapter 11 debtor case were entitled to post-petition interest at the default rates provided in their contracts because they were entitled to have their equitable rights fully enforced under section 1124(1).  Id. at 203-04.

The Ultra Petroleum Court's analysis is not persuasive.  A bankruptcy court cannot use equitable principles to modify express language of the Code.  United States v. Noland, 517 U.S. 535, 538 (1996).  Section 502(b)(2) expressly disallows claims of unsecured creditors for unmatured interest.  When a debtor is solvent, the Bankruptcy Code does not waive the application of section 502(b)(2).  The Third Circuit has held that section 1124(1) does not mandate that unimpaired creditors receive all of their contract rights where those rights are expressly disallowed by section 502(b) of the Code.  PPI, 324 F.3d at 202-03.[32] Therefore, under Third Circuit precedent, this Court cannot agree with the Bankruptcy Court in Ultra Petroleum that being

---

[32]    Significantly, in PPI, the Third Circuit held that a landlord's claim was capped by section 502(b)(6) even though that conclusion meant that the debtor's equity would be getting a distribution (i.e., it was a solvent chapter 11 debtor case). 324 F.3d at 200-04.

unimpaired mandates that the Noteholders receive their contract rate of interest in contravention of section 502(b)(2).

The Indenture Trustees also rely on the Bankruptcy Court's decision in Energy Future.   In re Energy Future Holdings Corp., 540 B.R. 109 (Bankr. D. Del. 2015).   In that case the Bankruptcy Court was considering an objection to the unsecured PIK noteholders' claims to post-petition interest and concluded that any claim for post-petition interest must be disallowed as a result of section 502(b).   Id. at 111.   The Court, however, then elaborated on what the debtors' plan would have to provide in order for those creditors to be unimpaired.   It concluded that the "plan in this case need not provide for the payment in cash on the effective date of post-petition interest at the contract rate in order for the PIK Noteholders to be unimpaired."   Id. (citing PPI, 324 F.3d at 205).   Nonetheless, the Court concluded that under the equitable concepts embodied in the fair and equitable test under section 1129(b), "the Court has the discretion to exercise its equitable power to require, among other things, the payment of post-petition interest, which may be at the contract rate or such other rate as the Court deems appropriate."   Id. at 124.

The Court finds the test articulated by the Bankruptcy Court in Energy Future, however, to be problematic.   First, the Court relied on the fair and equitable test of section 1129(b), which

40

by its express terms does not apply to unimpaired creditors.[33]

Further, it provides no guidance to debtors or creditors as to

precisely how unimpaired creditors must be treated and thus will

result in endless litigation.  Finally, leaving the determination

of what interest, if any, an unimpaired creditor is entitled to

receive in a solvent chapter 11 debtor case completely within the

discretion of the bankruptcy court also runs counter to recent

Supreme Court jurisprudence (and Congressional amendments) that

have sought to curb the bankruptcy court's exercise of equitable

discretion.[34]

> d.  <u>Proper Treatment of Unimpaired Creditors in
> Solvent Chapter 11 Debtor Cases</u>

The Court is not persuaded that the Bankruptcy Code

incorporated the solvent debtor exception to the extent suggested

by the Bankruptcy Courts in <u>Ultra Petroleum</u> (to mandate the

---

[33]    11 U.S.C. § 1129(b) (mandating that the court "shall
confirm the plan . . . if the plan does not discriminate
unfairly, and is fair and equitable, with respect to each class
of claims or interests that is <u>impaired</u> under, and has not
accepted, the plan.") (emphasis added).  <u>See also</u> <u>PPI</u>, 324 F.3d
at 205 n.14.

[34]    <u>E.g.</u>, <u>Norwest Bank Worthington v. Ahlers</u>, 485 U.S. 197,
206 (1988) (rejecting equitable arguments that absolute priority
rule did not apply to the case at bar, the Court concluded that
"whatever equitable powers remain in the bankruptcy courts must
and can only be exercised within the confines of the Bankruptcy
Code."); <u>In re Frederickson</u>, 545 F.3d 652, 658 (8th Cir. 2008)
("In enacting BAPCPA, Congress reduced the amount of discretion
that bankruptcy courts previously had over the calculation of an
above-median debtor's income and expenses . . . . to eliminate
what it perceived as widespread abuse of the system. . . .").

reinstatement of all contract rights to interest notwithstanding their disallowance by section 502(b)) and in Energy Future (to permit the exercise of broad equitable discretion by the bankruptcy court to determine what interest, if any, unimpaired creditors are entitled to receive).  Rather, after consideration of the cases cited by the parties, the express language of the Bankruptcy Code, and its Legislative History, the Court is convinced that the solvent debtor exception survived passage of the Bankruptcy Code only to a limited extent.  The Bankruptcy Code expressly codified the solvent debtor exception in section 506(b) as to oversecured creditors and in section 1129(a)(7) and 726(a)(5) as to unsecured creditors.  While the latter sections currently only apply to impaired creditors, when the Bankruptcy Code was originally enacted they applied to all unsecured creditors, impaired and unimpaired.[35]  As the Court concluded above, when the 1984 amendment made section 1129(a)(7) applicable to impaired creditors only, Congress was motivated by the desire to require voting only by impaired creditors, rather than by a desire to assure that unimpaired creditors get their contract rate of interest.[36]

---

[35]    An Act to Establish a uniform Law on the Subject of Bankruptcies, Pub. L. No. 95-598, § 1129(a)(7), 92 Stat. 2549 (1978).

[36]    See discussion in Part C.2.b, supra.

Significantly, neither the Bankruptcy Code nor the Legislative History expressly state that unimpaired creditors are entitled to their contract rate of interest or even to <u>more</u> than impaired creditors in the case of a solvent debtor.  Instead the Legislative History provides strong evidence Congress intended that unimpaired creditors in a solvent chapter 11 debtor case should receive post-petition interest only in accordance with sections 1129(a)(7) and 726(a)(5).[37]  That is what the Debtors contend the Noteholders are entitled to receive in this case.

The Indenture Trustees complain, however, that the Debtors treated the Noteholders not as impaired, but as unimpaired, thereby depriving them of the right to vote.  The Court finds that the result would have been no different.  If the Noteholders had been treated as impaired and if they had voted against the Plan, they would have received the same treatment: payment in full in cash of their allowed claim plus post-petition interest in accordance with sections 1129(a)(7) and 726(a)(5).[38]

It is important to emphasize that the Court's ruling in this case is limited to the issue of what post-petition interest

---

[37]    <u>Id.</u>

[38]    Of course, even unimpaired creditors have the right to object to confirmation of the plan.  It appears that the Indenture Trustees agreed that, rather than object to confirmation of the Debtors' Plan in this case, their objection to treatment of the Noteholders' claims would be decided in this adversary (or the claims resolution process).  (D.I. 5261 at ¶¶ 26 & 27.)

unimpaired creditors must receive in the rare case when a chapter
11 debtor proves to be solvent and their claims are being paid in
full in cash on the effective date of the plan.  Concluding that
sections 1129(a)(7) and 726(a)(5) apply to both impaired and
unimpaired unsecured creditors where the debtor is solvent does
not offend the basic policy of the Bankruptcy Code to assure that
creditors of the same priority generally receive like treatment.
While section 726(a)(5) is made applicable in chapter 11 cases
only to impaired creditors, when a debtor is solvent, impaired
creditors essentially are unimpaired, in the sense that they are
entitled to payment in full of their allowed claims and post-
petition interest, albeit at the federal judgment rate, before
any distribution can be made to equity.  11 U.S.C. §§ 726(a)(5) &
1129(a)(7).  The Legislative History to section 1124(3)'s repeal
suggests that Congress believed that there is no legitimate
reason when a debtor is solvent to distinguish between impaired
and unimpaired unsecured creditors who are receiving payment of
their claims in cash in full.  Consequently, the Court concludes
that both should receive the same treatment: payment of their
allowed claim plus post-petition interest at the federal judgment
rate in accordance with section 726(a)(5).

Such a rule promotes several important policies of the
Bankruptcy Code.  First, as noted, it is consistent with the
underlying principle of the Bankruptcy Code that creditors with

44

the same priority (such as unsecured creditors) should be similarly treated.  Providing that all general unsecured creditors are entitled to the same post-petition interest in a solvent chapter 11 debtor case prevents a debtor from paying preferred creditors more than others simply by classifying them as unimpaired.

Second, it is an easy and predictable rule to apply (as opposed to determining interest based on each creditor's contract rights or relying on discretion exercised by the court on a case by case basis).  This promotes predictability and the efficient administration of the bankruptcy estate.[39]

The Court in PG&E reached a similar conclusion.  610 B.R. at 315.  That Court addressed the arguments of numerous unimpaired creditors that they were entitled to post-petition interest at various rates, determined by contracts between the debtors and the respective claimants, different state's judgment rates, or some other rate.  Id. at 310.  It rejected those arguments noting that

> Cardelucci, in answering the narrow question [of what the proper rate of post-petition interest is in a solvent chapter 11 debtor case], drew no distinction as to whether the rule it announced was confined only to impaired claims.  The clear and unequivocal analysis based on section 726(a)(5) is obvious: it applies to

---

[39]    While the Indenture Trustees assert that the calculation of their contract interest claim is a relatively simple math exercise, in large cases with multiple unimpaired creditors that would not be true.  E.g., PG&E, 610 B.R. at 310.

all unsecured and undersecured claims in a surplus
estate.

Id. at 315.

Consequently, the Court concludes that the Indenture
Trustees have not stated a plausible claim that the Debtors must
pay post-petition interest on the Notes at the rates specified in
the Indentures rather than at the federal judgment rate.  As a
result, the Court will grant the Debtors' Motion to Dismiss Count
2 of the Complaint.[40]


IV.  <u>CONCLUSION</u>

For the reasons set forth above, the Court will grant the
Debtors' Motion to Dismiss Count 1 as to the 2022/2024 Senior
Notes, but deny it as to the 2026/2028 Senior Notes, and grant
the Debtors' Motion to Dismiss Count 2.

An appropriate Order follows.



Dated: December 22, 2021          BY THE COURT:

                                  Mary F. Walrath
                                  United States Bankruptcy Judge


---

[40]   As a result of this conclusion, to the extent that the
Court determines that the redemption premium is the economic
equivalent of interest, that claim too would be limited by the
application of the federal judgment rate.